In the Matter of ACF INDUSTRIES, INC., Appellant, and UNITED STATES OF AMERICA, Intervenor-Appellant, v. BOARD OF ASSESSORS OF THE CITY OF BUFFALO, Respondent.

Fourth Department, May 11, 1961.

*Neil R. Farmelo, United States Attorney for Western District of New York (William Massar, Charles K. Rice, Lee A. Jackson and Myron C. Baum of counsel), for appellant and intervenor-appellant.*

*Anthony Manguso, Corporation Counsel (Abraham I. Okun of counsel), for respondent.*

HALPERN, J. The question presented is whether a building erected by the petitioner-appellant ACF Industries, Inc., pursuant to a contract with the Atomic Energy Commission, an agency of the United States, was immune from real estate taxation by the City of Buffalo for the year 1958–1959.

The building was erected on land leased by ACF Industries, Inc., with the right to remove the building upon the expiration of the lease. The building was therefore taxable as the real property of ACF Industries, Inc., separately from the land, under the definition of real property in section 2 of the Tax Law (*People ex rel. Hudson Riv. Day Line* v. *Franck*, 257 N. Y. 69), unless it was immune from taxation by reason of the relationship of the United States Government to the project.

The date as of which the taxability of the property is to be determined under the Charter of the City of Buffalo is December 1, 1957. In our opinion, the United States Government, through the Atomic Energy Commission, was the beneficial owner of the property on that date and the property was therefore immune from taxation.

The Atomic Energy Commission, hereinafter referred to as the Commission, entered into a contract with ACF Industries, Inc., hereinafter referred to as ACF, on April 4, 1954, for the performance of certain work for the Commission. The contract provided for reimbursement to ACF of all costs incurred by it and payment to it of a fixed fee as its compensation. The existing plant facilities of ACF were not adequate to enable it to perform the work within the time contemplated and the contract therefore provided that ACF would take a lease of land owned by the Pennsylvania Railroad Company adjoining ACF's existing plant and would construct upon the leased land a new plant in accordance with the plans to be approved by the Commission. The cost of construction was to be borne in the first instance by ACF but it was to be reimbursed in monthly installments over a five-year period. The plant was built in accordance with the contract and was used for the performance of the work for the Commission as provided in the contract. The Commission had the right to terminate the contract at any time but, if it did so before the cost of construction had been fully reimbursed to ACF, the remaining installments were to be paid at once.

The Commission elected to terminate the contract on October 31, 1957, and it thereupon paid to the ACF all the remaining installments of the cost of construction. Under the terms of the contract, the Commission had the right to exercise one of three options upon termination of the contract: (a) It could require ACF to convey title to it without any further payment, (b) it could require ACF to make the facilities available to it for a specified period not to exceed 20 years, the term of the lease, or (c) it could " [n]otify the contractor that it [did] not desire title to nor the future use of the new facilities ". The Commission elected to exercise option " c ". Under the provisions of the contract, ACF had 60 days thereafter in which to determine whether it desired to retain the new facilities and, if it elected to do so, it was to pay the Commission " the fair value of the new facilities ", as agreed upon between it and the Commission. If, however, ACF notified the Commission that it did not wish to use the new facilities, the property was to be disposed of as follows: " the contractor shall at the written

request of the Commission and in accordance with the Commission's instructions undertake to dispose of the new facilities and shall remit the purchase price, less a reasonable fee to be agreed upon, to the Commission ".

The last-quoted provision was the one which was operative on December 1, 1957. Prior to that date, ACF had notified the Commission that it did not desire to retain the building and the Commission had requested it, in accordance with the terms of the contract, to undertake to dispose of the building. Whatever interest ACF may have had in the building prior to that time, it had none thereafter; it was simply in the position of an agent seeking to obtain the highest possible price for the benefit of the Commission in return for a reasonable fee for its services.

We may agree with the city that the legal title of the building was still in ACF, the Commission having elected not to have the title transferred to it pending the sale. But this was not controlling. The crucial question was who had the beneficial ownership, not who had the legal title. "We believe that the appropriate test would turn on practical ownership of the property rather than the naked legal title" (*Rohr Aircraft Corp.* v. *County of San Diego,* 362 U. S. 628, 634). The *Rohr* case is directly in point and establishes the immunity from taxation of the building here in question. (See, also, *Hopkins Univ.* v. *Board of County Comrs.,* 185 Md. 614.)

While the contract is silent on this point, we think that the Commission could have directed ACF to convey title to it at any time during the pendency of the sale, even though it had elected not to have title transferred to it in the first instance. If the Commission had directed the transfer of title to it in the first instance, this would have had the effect of cutting off the option of ACF to purchase the building at the current fair value for its own use. This the Commission apparently did not wish to do but, after ACF declined to exercise its option, the Commission was back in full control of the property and had the right to direct its disposition in any manner it saw fit. As a matter of convenience, to facilitate the disposition of the property, the Commission allowed the title to remain in ACF pending the finding of a purchaser but, as we have seen, the location of the legal title is not determinative of the taxability of the property.

The Special Term opinion (which was handed down prior to the decision of the *Rohr* case by the United States Supreme Court) interpreted the contract as conferring upon the Commission a mere contractual interest in the proceeds of the sale as distinguished from a beneficial property interest in the building itself. It reasoned that the Commission was entitled only to a

refund of the cost of construction which it had paid to ACF, although it recognized that the amount of the refund was to be " measured by the amount " which ACF received upon the sale of the building. This is a strained and artificial interpretation. As the Special Term itself recognized, the contract did not limit the interest of the Commission in the proceeds of the sale to the amount of the cost of construction theretofore paid. On the contrary, it provided that ACF should remit to the Commission the whole of the purchase price, less only a reasonable fee to be agreed upon. We cannot accept the view of the Special Term that the Commission only had a claim of a contractual nature. The beneficial ownership of the building was, in our opinion, in the Commission.

The question of immunity of Federal property from taxation is, of course, governed by Federal law and is not controlled by the property law of the State (*United States* v. *Allegheny County,* 322 U. S. 174) but it may be worth noting that the New York statutes give added support to the conclusion here reached. Under sections 92 and 93 of the Real Property Law, a trust, under which the beneficiary is entitled to the possession and profits of the property and under which no active duties are imposed upon the trustee, is a passive trust and the trust is automatically executed and legal title vested in the beneficiary. ACF had no right to possession or use of the building after the termination of the contract. The only duty which rested upon ACF after it had elected not to retain the building was to try to sell the building as the agent of the Commission. Such an agency is not sufficient to vest legal title in the agent, under the New York statutes (cf. Real Property Law, § 97; *Chamberlain* v. *Taylor,* 105 N. Y. 185). If a conveyance had been made to ACF upon the terms under which it held the property on December 1, 1957, the legal title would be deemed to have vested by operation of law in the Commission (*Matter of Reed* v. *Browne,* 295 N. Y. 184; see, also, Restatement, Trusts [2d], §§ 67–68).

The city relies upon various provisions of the contract to support its view that during the period of operation thereunder, ACF had the beneficial ownership of the property. There is no need in this case to examine those provisions and to come to any conclusion upon the question of where the beneficial ownership rested during the period of operation. We are concerned here only with the question of beneficial ownership on the taxable status day, December 1, 1957. Prior to that date, operation under the contract had terminated, all the respective options of the parties had been exercised or declined and the unqualified beneficial ownership had vested in the Commission.

The order appealed from should therefore be reversed and the assessment for the year 1958–1959 annulled.

BASTOW, J. P., GOLDMAN, McCLUSKY and HENRY, JJ., concur.

Order unanimously reversed on the law and facts and assessment annulled, without costs of this appeal to any party. Certain findings of fact disapproved and reversed and new findings made.