# JOHNS HOPKINS UNIVERSITY *v.* BOARD OF COUNTY COMMISSIONERS OF MONT-GOMERY COUNTY

[No. 51, October Term, 1945.]

*Decided February 6, 1946.*

The cause was argued before MARBURY, C. J., DELAPLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*J. Crossan Cooper, Jr.,* with whom was *Venable Baetjer & Howard* on the brief, for the appellant.

*Hall Hammond, Deputy Attorney General,* with whom was *William Curran, Attorney General,* on the brief for the appellee State Tax Commissioners; *Joseph A. Cantrel,* on the brief for the appellee, Board of County Commissioners.

GRASON, J., delivered the opinion of the Court.

In 1941 the Government of the United States was greatly concerned with the condition of world affairs and of the probability that it might be drawn into the vortex of a world war. Its weapons of defense were greatly depleted, some being old and antiquated, those which were modern and up-to-date existed only to a limited extent, and scientific agencies needed in matters of research to keep pace with modern implements of war were in great demand. In that year the President of the United States, by Administrative Order, May 25, 1940, created the office of Emergency Management in the Executive Office of the President. One of the organizations created by the Office of Executive Management was the Office of Scientific Research and Development. Executive Order June 28, 1941, No. 8807. This latter office will be hereafter referred to as the O. S. R. D.

The O. S. R. D. first operated within the limits of the City of Washington, but as its work expanded it outgrew its quarters, and in March, 1942, it asked the Johns Hopkins University to undertake and carry out, on a much larger scale, operations relating to the war efforts of the Government. It entered into a contract with Hopkins, under which it purchased for the Government two parcels of land, aggregating about 40 acres, situate in or near Silver Spring, in Montgomery County, Maryland, and erected thereon a plant to carry out

scientific research for the Government, and when erected the Government removed its men and equipment from its old location to this new plant. Hopkins paid for the land, the erection of the plant, the cost of operations there conducted, and the taxes on the plant, all of which was repaid by the Government to Hopkins.

Hopkins is a university and does not engage, as such, in the work it was called on to do by the Government, which was then at war, and it will have and has no use for this plant in carrying out its functions as a university. Hopkins conducts its university at Baltimore, Maryland. This plant was erected near the City of Washington, because a Naval Officer was the director of the Bureau of the Research Division of the Bureau of Ordnance, and under him was the chairman of the section of the O. S. R. D., known as Section T., and Hopkins took its instructions with respect to the operations from this chairman. It was, therefore, necessary for high government naval officers to keep in close touch with the operations of the plant and hence, no doubt, was the reason for the location of the plant at Silver Spring, which is close by.

The contract between Hopkins and the O. S. R. D., among other things, contains the following: "The Contractor (The Johns Hopkins University) shall convey to the Government or to its designee, when and as directed by the Contracting Officer any lands purchased hereunder or under said agreement for the cost of which reimbursement is claimed hereunder or under said agreement, together with all buildings, improvements, rights, and privileges, and appurtenances belonging or appertaining thereto."

This plant, the title to which, on the Land Records of Montgomery County, stands in the name of the Johns Hopkins University, was assessed against it for tax purposes for the years 1944 and 1945. Hopkins resisted the tax, asserting its interest in the property is solely as agent or trustee for the United States and that the assessment of the plant is an attempt to tax United States

property in violation of the Constitution of the United States and Section 7(21) of Article 81 of the Annotated Code of Maryland (1939), exempting from taxation property exempted by the Constitution.

Appellees contend that the record owner, under the Maryland law, is the owner for tax purposes and that the assessors are not required to go back of the Land Records in determining to whom property is assessable. They claim that under the Maryland law a tax claim is personal and a suit for taxes can be maintained against the record holder of real estate. They further claim that the tax involved here is not a direct tax on property of the United States but it is a tax on Hopkins as the agent of the United States, and a tax upon such agency does not violate the immunity against taxation accorded Government property.

There is no doubt of the rule applied generally in Maryland regarding property, the title to which, in law, is vested in a trustee. A number of cases are cited by appellees to establish the Maryland rule. It is sufficient to refer to the following cases:

In *Grand Lodge of Maryland, Knights of Pythias v. Mayor and City Council of Baltimore*, 157 Md. 542, at pages 546, 547, 146 A. 744, at page 746, where the rule is set out and a number of the cases and text authorities are cited, it is said: "The general rule is that, unless otherwise prescribed by statute, the trustees as the owner of the legal estate would be assessed with the value of the land. As stated in *Cooley on Taxation* (4th Ed.), Sec. 1097: 'By the owner of property for the purpose of assessment is meant the legal, and not the equitable, owner; therefore trustees having the legal title are properly assessed.' *Ibid*, Sec. 1103; *Perry on Trusts* (7th Ed.), Sec. 331. This rule is commended by its utility, simplicity, and universality; and so makes for the certain and prompt collection of taxes upon real estate. *Hill v. Williams*, 104 Md. 595, 603, 604, 65 A. 413. Although it is not so with respect to personal property (Code, Art. 81, Sec. 226), there is no statute

affecting the application of the rule to real estate, and the various sections of the revenue law of the state that relate to the imposition of taxes upon real estate are consistent with the enforcement of the rule."

In *Latrobe v. Mayor, etc., of Baltimore,* 19 Md. 13, a trustee was sued at law by the City of Baltimore for taxes assessed on mortgages of property in the City of Baltimore. There the Court said: "The appellee, in resorting to its remedy at law, assumes that the taxes assessed constitute a legal cause of action, and that the appellant, as the holder of the legal title of the property upon which the assessment was made, is liable for its satisfaction. That taxes assessed upon a trust estate, constitute a legal cause of action against the holder of the legal title, we do not doubt, for at law the legal estate in the hands of a trustee, has the legal incidents and obligations of an absolute title, subject only to the claims in equity of the *cestui que* trust."

If this was a case not involving property interests of the United States Government, the judgment of the Court below could not be questioned. We regard the case of the *United States of America and Mesta Machine Company v. County of Allegheny, Pennsylvania,* 322 U. S. 174-198, 88 L. Ed. 1209, as conclusive of the case at bar. The Mesta Machine Company was engaged in heavy industry. The Government desired it to manufacture certain ordnance. It needed heavy machinery in order to manufacture the ordnance which the Government desired. The Government supplied the company with this machinery which was installed in its plant, and was leased to the company. Allegheny County assessed to Mesta, as part of the real estate, the machinery supplied by the Government, although it itemized various items showing the value thereof, including the machinery furnished by the Government. The Supreme Court of the United States, in this case, reversed the Pennsylvania Court and held that the machinery supplied Mesta by the Government was immune from taxation. The Supreme Court quoted *Carpenter v. Shaw,* 280 U. S. 363,

367, 368, 50 S. Ct. 121, 74 L. Ed. 478, 482: "Where a federal right is concerned we are not bound by the characterization given to a state tax by state courts or Legislatures, or relieved by it from the duty of considering the real nature of the tax and its effect upon the federal right asserted." 322 U. S. 174, 74 L. Ed. 484.

It held that: "any contractual obligation of the War Department to pay Mesta's taxes does not operate either to waive or to create an immunity. Nor is the validity of the tax dependent upon the ultimate resting place of the economic burden of the tax."

The Court further said. "The Commonwealth certainly has broad powers and choices of methods to tax Mesta, a corporation created by it and domiciled and operating within its borders. The trend of recent decisions has been to withdraw private property and profits from the shelter of governmental immunity but without impairing the immunity of the State or the Nation itself. Benefits which a contractor receives from dealings with the Government are subject to state income taxation, (Citing, *James v. Dravo Contracting Co.*, 302 U. S. 134, 82 L. Ed. 155). Salaries received from it may be taxed. The fact that materials are destined to be furnished to the Government does not exempt them from sales taxes imposed on the contractor's vendor. (Citing *State of Alabama v. King & Boozer*, 314 U. S. 1, 86 L. Ed. 3). But in all of these cases what we have denied is immunity for the contractor's own property, profits, or purchases. We have not held either that the Government could be taxed or its contractors taxed because property of the Government was in their hands. The distinction between taxation of private interests and taxation of governmental interests, although sometimes difficult to define, is fundamental in application of the immunity doctrine as developed in this country. * * * Actual possession and custody of Government property nearly always are in someone who is not himself the Government but acts in its behalf and for its purposes. He may be an officer, an agent, or a contractor. His personal

advantages from the relationship by way of salary, profit, or beneficial personal use of the property may be taxed as we have held. But neither he nor the Government can be taxed for the Government's property interest. Rarely does a state or municipality pursue the Federal Government itself."

Again the Court said in this case: "We hold that Government-owned property, to the full extent of the Government's interest therein, is immune from taxation either as against the Government itself or as against one who holds it as a bailee."

The appellees strongly rely upon *James v. Dravo Contracting Company* and *State of Alabama v. King & Boozer, supra,* but in view of the Mesta case we cannot give to these cases the controlling effect on the case at bar as urged by appellees. We shall not discuss the various other cases cited, as we regard that the Mesta case controls.

The evidence in the case clearly shows that Hopkins holds the mere naked title to the properties in question. The equitable title is vested in the Government, and Hopkins, under its contract with the Government, is bound to deed the property to it or its designee. It cannot, therefore, be said that the Government has not an interest in the properties in question. The title to the properties was in Hopkins, but, says the Mesta case, the title may be in "an officer, an agent, or a contractor. His personal advantages from the relationship by way of salary, profit, or beneficial personal use of the property may be taxed as we have held. *But neither he nor the Government can be taxed for the Government's property interest.*" [322 U. S. 174, 74 L. Ed. 484.] (Italics supplied.)

We think, therefore, that the ruling of the lower court was erroneous and the same is reversed.

> *Judgment reversed with costs, case remanded that an order may be passed in accordance with this opinion.*