ALBAN TRACTOR CO., INC. *v.* STATE TAX COMMISSION ET AL.

[No. 200, September Term, 1958.]

*Decided April 17, 1959.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*G. Van Velsor Wolf* and *W. Gibbs McKenney,* with whom were *Andre W. Brewster, Piper & Marbury* and *Herbert L. Wynne* on the brief, for appellant.

*Joseph S. Kaufman, Assistant Attorney General,* with whom was *C. Ferdinand Sybert, Attorney General,* on the brief, for appellee.

HORNEY, J., delivered the opinion of the Court.

Alban Tractor Company, Inc. (Alban) has appealed from an order of the Circuit Court for Baltimore County affirming an order of the State Tax Commission of Maryland (the Commission), which, for the purposes of state and county taxes for the years 1955 and 1956, assessed Alban with the full value of certain tangible personal property.

Claiming that it had previously sold all of the property so assessed under a financing arrangement known in the business world as a "machine lease agreement" and that it had assigned all of its right, title and interest in more than 70% of such lease agreements to financing institutions, Alban contends that such equipment—since it was not stock in its business—did not constitute a part of its taxable inventory.

Alban, a Delaware corporation, with its principal place of business in Baltimore County, is the distributor in this State for the earth-moving and road-building machinery and equipment manufactured by the Caterpillar Tractor Company.[1] Its principal business was the selling of new machinery and servicing it. Rental was not a regular part of its business, but on infrequent occasions it would rent traded-in machinery temporarily to a purchaser in immediate need thereof until the new machinery wanted arrived for delivery. Distribution of the machinery was initiated by salesmen who secured a written purchase order signed by the customer. Three forms of financing were used—cash, a conditional sales contract, under which a 20% down payment was made and the balance was paid over a period of months, and the machine lease agreement—used only when a customer requested it— under which no down payment was required. However, the lease agreement was otherwise similar to a conditional sales contract in that the installment payments on account of the purchase price, plus the 2% sales tax, were made monthly over a relatively short period of time when compared to the useful life of the equipment. The only down payment was the first monthly payment of approximately one-tenth to one-

---

1. For the sake of brevity such machinery and equipment is hereinafter referred to as "machinery."

fifteenth of the purchase price. At the end of the lease period the purchaser—referred to as the "lessee" in the lease agreement—had an option to purchase the machinery by paying the small balance due, plus 6% interest on the unpaid monthly balances. The lessee invariably exercised his option to "purchase" the machinery at the end of the lease period.

In its accounting procedures, Alban treated its lease agreements as it did its conditional sales contracts in that the obligation of the purchaser was set up as a receivable on its books. It paid its salesmen the full commission on a "lease" sale, as it did on conditional and cash sales, that is, promptly upon the completion of the initial arrangement to buy. The transaction was reported as a sale for income tax purposes and no depreciation was claimed as a deduction.

As provided in the lease agreement, title to the purchased machinery was retained by the "lessor" for security purposes until the last payment was made by the "lessee." Other than a receipt showing that all payments had been made, no bill of sale or other written instrument was delivered to the purchaser unless he requested it. The lease agreement was simply marked "satisfied" on the conditional sales records in the clerk's office where they were recorded. In addition to retaining title, each piece of machinery was identified by means of a metal tag riveted thereto reading: "Owned and Leased by Alban Tractor Company, Inc." Each lease agreement was recorded in the county where the purchaser resided, or, if the purchaser was a corporation, where its principal office was located. As was the case with respect to a conditional sales contract, no recordation tax was paid on a machine lease agreement. While machinery was delivered to a purchaser at a particular location, it was thereafter moved from job to job and Alban had no way of accurately ascertaining where it was actually located—whether in or out of Maryland or, if it remained in this State, in which county it was located. Some of the equipment, however, was knowingly sold for use outside of Maryland. The Commission assessed all of such machinery to Alban in Baltimore County.

Several questions are presented by this appeal, but the principal one—and the only one it is necessary for us to con-

sider is whether the machinery sold under its machine lease agreements was assessable to Alban. We think it was not. Alban, as the titleholder of the machine lease agreements, had only a security interest and, under the laws of this State, the holder of a security interest may not be treated as the owner for the purposes of ordinary taxation.

(i)

We think it is clear that the machine lease agreements were but a form of a conditional sales contract, a security "device," and not a lease within the ordinary meaning of a contract to rent. In *Beckwith Machy. Co. v. Matthews*, 190 Md. 182, 57 A. 2d 796 (1948), we construed an agreement which was substantially the same as the machine lease agreement in this controversy. In that case we held that the agreement, while in the form of a lease of machinery, was in fact a conditional sales contract which had to be recorded in order to protect the interest of the vendor therein from the claims of subsequent creditors of the vendee. At p. 192, we stated:

> "In determining whether or not a given instrument is a conditional sales contract, we must find what the intention of the parties was at the time it was entered into. The situation of the parties, their purpose, the thing they sought to accomplish, and the method employed, are all important."

In the *Beckwith* case, *supra*, we cited, with approval, the case of *In re Rainey*, 31 F. 2d 197, 199 (D. C. Md. 1929), which distinguished an ordinary lease from a conditional sale as follows:

> "The distinction * * * is obvious. A lease contemplates only the use of the property for a limited time and the return of it to the lessor at the expiration of that time; whereas, a conditional sale contemplates the ultimate ownership of the property by the buyer, together with the use of it in the meantime."

Also of significance is the fact that the Attorney General

of Maryland in 35 *Ops. Atty. Gen.* 309 (1950) ruled that a machine lease agreement of Alban—of the same type it used in 1955 and 1956—was a conditional sales contract and did not require recordation tax stamps as a prerequisite to recording.

In the instant case, the Commission seeks to distinguish the *Beckwith* case, *supra,* and the opinion of the Attorney General, by stating—since this Court must determine the intention of the parties as of the time the lease agreement was entered into—that because there was in fact an election by the parties to use the machine *lease* agreement to consummate the transaction instead of a *conditional sales* contract, such election requires a finding that there was a lease [in the ordinary sense] of the machinery rather than a purported sale thereof. However, as we see it, we must ascertain the intention of the parties by looking at the effect of the terms of the agreement on the parties instead of by the convenient name the parties may have given to the agreement.

Here, the amount of the "rent" was greatly disproportionate to the value of the machinery and the useful life thereof. There was an option to purchase by paying only the small balance [principal and interest] remaining unpaid at the end of the term. The salesman was paid an immediate commission on the entire sales price at the time the "lease" was executed. And, despite the fact that a sales tax had not at that time been extended to rentals, the amount of the sales tax due on the "leased" property was charged as a part of the entire purchase price to the "lessee" and the sales tax due thereon was paid to the State as was the case with cash and *conditional* sales. The transaction was intended to be a sale and not an ordinary lease. *Beckwith Machy. Co. v. Matthews, supra.* Cf. 2 Williston *Sales,* § 336 (Rev. Ed. 1948). See also 47 Am. Jur. *Sales,* § 836; 92 A. L. R. 304, 323; 43 A. L. R. 1247, 1257. Since the transaction was a sale it is clear that the title reserved by the seller in the property when it was delivered to the buyer was in effect a reservation of a "security interest." [2] Of course, whether a lease is intended

2. See Art. 1 § 1-201(37) of the Uniform Commercial Code (1957),

as security must be determined by the facts in each case. However, the mere inclusion in the lease of an option to buy did not imply that the lease was intended as a security device. But, when this lease provided that upon compliance with its terms the lessee had an option to become the absolute owner of the property without further consideration or for a nominal consideration, then it is clear that the lease was intended to secure the holder of the security interest, and we so hold.

(ii)

We also think it is clear that one who holds the legal title to tangible personal property only as security has never been, and is not now to be, taxed as an owner under the statutory scheme of taxation in this State.

Code (1951), Art. 81, § 7 [3] provides that all tangible personal property by whomsoever *owned* shall be "subject to assessment *to the owner* and taxation *for* ordinary taxes." [4] (Emphasis added.)   Subsection (6) of § 7, *supra,* provides that "[t]he stock is in business of every person, firm or corporation engaged in any manufacturing or commercial business * * * shall be deemed permanently located in the county and/or city where such business is carried on."   And § 12(b) [5] provides in part that real and personal property "subject to ordinary taxation * * * shall be valued and assessed for purposes of [s]tate, county and city taxation by the State Tax Commission: * * * (5) [t]angible personal property belonging to any corporation, domestic or foreign."

For the years 1955 and 1956, the Commission undertook to assess to Alban, as part of its "stock in business," *i.e.* its inventory, the machinery which Alban had previously sold under its machine lease agreements to various purchasers.

---

[not adopted in this State], for a definition of "security interest" and a statement as to what is and what is not considered to be a security interest.

3. Section 8 in the Code of 1957.

4. Code (1951), § 5 [§ 6 in the Code of 1957] provides in part that "direct taxes * * * shall be ordinary taxes."

5. Section 13 (b) in the Code of 1957.

The assessment was made against the "leased" machinery as inventory, which it clearly was not, and as if all of it was located in Baltimore County, which was not a fact. Much of it was located in other counties and some of it was even sold outside the state. The result was to attribute an artificial tax situs to a part of such property, and in effect deprived the taxing authorities in other jurisdictions of a tax upon such of it as was located there. Moreover, in making the assessment, the Commission did not rely on—indeed made no reference to—the grounds it stood on in the court below and now stands on in this Court. The opinion of the Commission shows that the challenged assessments were made on the theory that Alban, as the holder of the legal title, even though for security purposes only, was the owner within the meaning of § 7, *supra.* The Commission below and here has relied on its Regulation 10—adopted December 18, 1953— which read as follows:

"Ownership of Personal Property.—Where title to personal property is in one person and possession or control of the same in another, as lessee, custodian, consignee, bailee or otherwise, either the title holder or the person in possession or control shall be deemed to be the owner of such property for purposes of ordinary taxation."

It is urged that the regulation was justified by § 3 (c) [6] [of Art. 81 of the Code of 1951], which provides in the part here pertinent:

"The owner of a life estate or other particular freehold estate, or term for years perpetually renewable, in real or personal property shall be treated as the owner of the property for purposes of ordinary taxation, and shall be chargeable with the taxes thereon. The State Tax Commission is hereby authorized to determine by regulations in what other class or classes of cases a person in possession or

6. Section 4 (c) in the Code of 1957.

control, whether as lessee, custodian, consignee, bailee or otherwise, of real or personal property of any class or classes owned by another person shall or may be treated by the State Tax Commission or other assessing authorities as the owner of such property for purposes of ordinary taxation."

The plain language of § 3 (c), *supra,* indicates that its purpose was to permit the Commission to assess certain persons not the actual owners but who are in possession or control of property as if they were the owners. This construction is confirmed by the Report of the Tax Revision Commission of 1939 at pp. 121, 122 of its report. Manifestly Alban could not be assessed as one not an owner who is in possession or control of property for it was expressly assessed as an owner not in possession. Section 3 (c), *supra,* did not create or increase the power of the Commission to assess property to an owner. That power was derived from § 7, *supra.* Regulation 10 can help the Commission only if the term "owner" as used in § 7, *supra,* includes one who holds no more than a security interest. The judicial concept of taxation in this State and the consistent administrative practice shows that the Legislature in using the term "owner" did not intend that such term should embrace a bare title holder for security purposes. See *Hickey v. Peck,* 180 Md. 289, 23 A. 2d 711 (1942) ; *Allen v. County Comm'rs of Harford Co.,* 74 Md. 294, 22 A. 398 (1891) ; *Baltimore v. Canton Company,* 63 Md. 218 (1885). See also Report of the Tax Revision Commission of 1927 at p. vi and § 6 of the draft bill attached, which was adopted by Chapter 226 of the Acts of 1929, all of which make plain the distinction consistently drawn between the actual owners of property and those who hold only the legal title to such property as security for an indebtedness. The State admits that it has been its practice never to assess tangible personal property to a mortgagee, pledgee or conditional vendor. This unbroken administrative practice carries great weight. *Baltimore City v. Johnson,* 96 Md. 737, 54 A. 646 (1903) ; *Hess v. Westminster Savings Bank,* 134 Md. 125, 106 A. 263 (1919). On occasions the Legislature

has taxed one to whom a debt was owed but only as a tax on the debt and not on the property securing the debt. *Appeal Tax Court v. Rice,* 50 Md. 302 (1879); *Simpson v. Hopkins,* 82 Md. 478, 33 A. 714 (1896).

The term "title holder" as used in Regulation 10, *supra,* and the term "owner" as used in § 7, *supra,* does not include one who holds a bare legal title for security purposes only. This holding is in accord with the holdings of a vast majority of the courts in other jurisdictions. See *Cownie v. Local Board of Review, Etc.,* 235 Iowa 318, 16 N. W. 2d 592 (1944); *San Diego County v. Davis,* 1 Cal. 2d 145, 33 P. 2d 827 (1934); *State v. J. I. Case Co.,* 189 Minn. 180, 248 N. W. 726 (1933); *Massey-Harris Co. v. Lerum,* 60 S. D. 12, 242 N. W. 597 (1932); *State v. White Furniture Co.,* 206 Ala. 575, 90 So. 896 (1921); *Singer Sewing Mach. Co. v. Cooper,* 263 F. 994 (D. C. Ohio 1920). *Contra, Commonwealth v. National Cash Register Co.,* 271 Pa. 406, 114 A. 366 (1921). Cf. *Remington Cash Register Co. v. State Board of Taxes and Assessments,* 8 N. J. M. 875, 152 A. 330 (1930), *aff'd* 108 N. J. L. 402, 159 A. 93 (1932); *Singer Manufacturing Co. v. County Com'rs.,* 139 Mass. 266, 1 N. E. 419 (1885).

The order of the lower court will be reversed.

> *Order reversed and case remanded for the passage of an order in conformity with this opinion, the appellee to pay the costs.*