THE MARTIN COMPANY *v.* STATE TAX COMMISSION OF MARYLAND

[No. 206, September Term, 1960.]

(Two Appeals In One Record)

*Decided June 8, 1961.*

The cause was argued before Brune, C. J., and Henderson, Hammond, Prescott and Horney, JJ.

*Clarence W. Miles,* with whom were *William B. Rafferty* and *Lowell R. Bowen* on the brief, for The Martin Company, one of the appellants and cross-appellees.

*Joseph Kovner,* with whom were *Charles K. Rice, Assistant Attorney General, Lee A. Jackson* and *I. Henry Kutz, Attorneys, Department of Justice, Leon H. A. Pierson, United States Attorney,* and *John R. Hargrove, Assistant United States Attorney,* on the brief for the United States, the other appellant and cross-appellee.

*Thomas B. Finan, Attorney General, Joseph S. Kaufman, Deputy Attorney General, Ambrose T. Hartman, Deputy City Solicitor for Baltimore City,* and *Walter R. Haile, Assistant Solicitor for Baltimore County,* with whom was *Johnson Bowie, Solicitor for Baltimore County,* on the brief, for appellees and cross-appellants.

BRUNE, C. J., delivered the opinion of the Court.

The primary question in this case is the validity under Maryland tax laws of taxes assessed for the year 1958 against The Martin Company (Martin) on materials, work in process and finished products in Martin's possession under contracts with the United States for the production of guided missiles, aircraft, electronics systems and weapons systems. The State Tax Commission, acting in the exercise of its original jurisdiction, entered its final assessment thereon in the amount of approximately $77,000,000. On appeal the Circuit Court of Baltimore City affirmed the assessment, except as to certain items aggregating nearly $13,950,000, as to which it remanded the case to the Department of Assessments and Taxation (successor to the State Tax Commission, the "Commission," under Ch. 757 of the Acts of 1959, with respect to its assessing functions) for the entry of an appropriate order. The principal items held exempt were materials in transit and "special tooling," including tooling labor, overhead, and material and "tooling subcontract." The items included in special tooling, approximately $6,550,000 in amount, were held exempt as Government-owned property and were also held exempt from local taxation by Baltimore County, where Martin's plant is located, under the manufacturer's exemption ordinance or resolution of that County. (Some other property included under a different classification was also held entitled to this manufacturer's exemption.) After all these eliminations were made, the remaining assessments aggregated some $63,000,000. Appeals from the order of the Circuit Court were taken by Martin and by the United States, an intervening petitioner in that Court, and cross-appeals were taken by the Commission or its successor, and by Baltimore

City and Baltimore County, intervening respondents in the Circuit Court.

A number of questions, in addition to the primary question above stated, are raised or sought to be raised by the appeal or cross-appeals. Among them, on the side of the original appellants, are alleged discrimination against the United States and the proper basis of calculating costs of materials, work in process and finished products, if such items are taxable at all. The cross-appeals present questions as to whether or not claims for exemptions of goods in transit and for the Baltimore County manufacturer's exemption were waived because not raised before the Commission or by the petition of appeal and whether the jurisdiction of the Circuit Court was not terminated by Ch. 757 of the Acts of 1959, which repealed the section of the tax laws under which the appeal was taken to the Circuit Court of Baltimore City. We shall consider first this question of jurisdiction.

The Commission's final assessment was entered on December 17, 1958, and Martin filed its petition of appeal in the Circuit Court on January 8, 1959. The record before the Commission was certified to the Circuit Court on February 16, and the United States of America intervened on March 17, 1959. Baltimore City and Baltimore County intervened on October 13, 1959. The latter filed its motion to dismiss for lack of jurisdiction on March 19, 1960, and this motion was overruled. The basis for it was the repeal by Ch. 757 of the Acts of 1959 of the former Section 259 (b) of Article 81 of the Code (1957). Ch. 757 was approved by the Governor on April 28 and took effect on July 1, 1959. Under that Act the assessing functions of the State Tax Commission were transferred to the newly established Department of Assessments and Taxation, and its reviewing functions were transferred to the newly created Maryland Tax Court. As a part of this plan, Section 259 (b) was repealed, and in the place of the appeal to the Circuit Court provided thereunder from the Commission in the exercise of its original assessing functions, an appeal to the Maryland Tax Court was substituted, with a further appeal to the Circuit Court (in the Counties)

or to the Baltimore City Court, and a still further appeal to this Court. Baltimore County urges that this repeal, without any provision being made for cases pending at the time when the repeal became effective destroyed the former remedy to proceed in this case. It is claimed that the change is only one of remedy, an appeal to the Tax Court being substituted, and that there is no deprivation of a substantive right.

We do not find this contention persuasive. The appeal to the new Maryland Tax Court from the action of the Department of Assessments and Taxation in respect of the assessment of ordinary taxes which is provided for by Section 256 of Article 81 of the Code of 1957, as amended by Ch. 757 of the Acts of 1959, must be taken, (in accordance with Section 229 of that Article, as so amended), within thirty days from the date of the action or order complained of. That would be a manifest impossibility in the instant case, where the final action of the State Tax Commission (predecessor of the Department) had been taken more than six months before the effective date of the 1959 amendments; and there is no provision in the 1959 amendments which purports to transfer jurisdiction over an appeal already taken and pending in a Circuit Court to the newly created Tax Court. It is hardly to be supposed that the General Assembly intended that a taxpayer in the midst of seeking a remedy against an allegedly wrongful assessment should be deprived of any remedy by being barred on the one hand from the pursuit of the remedy previously allowed and on the other by a time limitation with which he could not possibly comply. We think that the statute was intended to be prospective only in substituting one course of appeal for another. See *Beechwood Coal Co. v. Lucas,* 215 Md. 248, 253-254, 137 A. 2d 680.

We accordingly think that the Circuit Court of Baltimore City correctly denied the motion to dismiss for lack of jurisdiction. We now turn to the primary question.

Martin had numerous contracts with the United States Government for the production of missiles, electronics systems and weapons systems and in 1958 was still producing some aircraft for the Government. Since these contracts are

classified as secret, only clauses not so classified and pertinent to this litigation have been offered in evidence. In general, these contracts are of two main types: first, fixed-price contracts; and second, cost-plus-fixed-fee contracts. Each type contains provisions relating to the vesting of title in the United States and Government controls over materials purchased or in course of manufacture covering custody and disposition, accounting and supervisions and inspection. There is no real dispute as to the sufficiency of the title-vesting clauses in each type of contract to vest technical, legal title to the materials in question in the United States. The appellees contend that technical, legal title is not controlling—that Martin has such possession, custody and control, and beneficial use of the property as to render Martin subject to taxation in respect thereof. The appellants contend that Martin's interest is neither actual ownership nor such ownership as to render the property taxable to it as a person in possession or control of property owned by another person.

Usual title-vesting clauses of the fixed price ("FP") type of contract and of the cost-plus-fixed-fee ("CPFF") type are as follows:

FP—

"Upon the making of any progress payments under this contract, title to all parts, materials, inventories, work in process and nondurable tools theretofore acquired or produced by the Contractor for the performance of this contract, and properly chargeable thereto under sound accounting practice, shall forthwith vest in the Government; and title to all like property thereafter acquired or produced by the Contractor for the performance of this contract and properly chargeable thereto as aforesaid shall vest in the Government forthwith upon said acquisition or production: Provided, that nothing herein shall deprive the Contractor of any further progress or final payments due or to become due hereunder; or relieve the Contractor or the Government of any of their respective rights or obligations under this contract."

CPFF—

"Title to all property furnished by the Government shall remain in the Government. Title to all property purchased by the Contractor, for the cost of which the Contractor is entitled to be reimbursed as a direct item of cost under this contract, shall pass to and vest in the Government upon delivery of such property by the vendor. Title to other property, the cost of which is reimbursable to the Contractor under this contract, shall pass to and vest in the Government upon (i) issuance for use of such property in the performance of this contract, or (ii) commencement of processing or use of such property in the performance of this contract, or (iii) reimbursement of the cost thereof by the Government, whichever first occurs. All the items to be furnished by the Government, as set forth in the Schedule or specifications, together with all property acquired by the Contractor title to which vests in the Government under this paragraph, are subject to the provisions of this clause and are hereinafter collectively referred to as 'Government Property.' "

Both types of contract are in general similar as to a number of matters. Under each the Government makes current payments as billed for materials, parts and work in progress. It exercises detailed supervision over accounting matters, physical handling, quality and use of materials. Its supervisory control extends over the purchase of materials and placement of sub-contracts. Though Martin is not the agent of the Government for the purchase of materials, title to materials purchased by Martin vests in the Government immediately upon acquisition by Martin under CPFF contracts and upon the making of the first progress payment under FP contracts. The Government has control over the disposition of surplus, spoiled or scrap material, and has eleven persons employed in this work. It maintains large staffs to carry out a continuous audit and to supervise the performance of contracts.

There are some differences between the two main types of contract, but each type recognizes that property to which the Government acquires title will be left in the possession of Martin to be used in the performance of the contract. Under the FP contracts the risk of loss of the property is on Martin, but Martin is required to carry insurance so written as to cover the Government's interest. Under CPFF contracts the Government assumes the risk of loss and acts as a self-insurer. There are also some differences in inventory control, though control is rather stringent in each case. Under FP contracts accurate and comprehensive records are required and periodic physical inventories are taken. Under CPFF contracts, in addition to complete inventory records, segregation of material is required, and Government owned property must be stored either in an enclosed and locked storeroom or on shelves marked to show that it is Government property.

The general effect of these controls is thus well summarized in the Government's brief:

> "In short, by the terms of the contracts, the Government takes title to specific identifiable property; it makes substantial partial payments for the property, and the property is left in the possession of the company to be used in the performance of the contract, under strict Government supervision and control."

The appellees rely upon Sections 4 (c), 8 (2) and (6), 9 (21), 13 (b) (5), 14 and 15 (a) of Article 81 of the 1957 Code, and the 1958 Supplement thereto, as sustaining the taxes here in question. (References hereinafter to Sections will (unless otherwise specified) be to Sections of Article 81 as contained in that edition of the Code and that Supplement thereto.) We shall pass Section 4 (c) for the present and return to it later.

The opening unnumbered paragraph and paragraph (2) of Section 8 reads in part as follows:

> "The following property, except as in §§ 9 and 10 provided, shall be subject to assessment to

the owner and taxation for ordinary taxes in this State and in the county and/or city specified below:

\* \* \* \*

"(2) *Tangible personal property.* — All tangible personal properties located in this State, by whomsoever owned, *including that owned or leased by the United States, or any department or agency of the United States, to the fullest extent possible under the Constitution of the United States and laws of the United States pursuant thereto and in conformity therewith,* in the county and/or city in which the same are respectively permanently located \* \* \*." (Emphasis supplied.)

Paragraph (6) of Section 8 establishes the local situs for taxation of the "stock in business" of a person, firm or corporation engaged in a manufacturing or commercial business in Maryland.

Section 9 enumerates numerous exemptions from taxation. Paragraph (21) thereof provides:

"Any property exempted from taxation by this State by the Constitution of the United States or by any act of Congress passed pursuant to and in conformity with the Constitution of the United States, *only to the extent that such exemption is so required and no further.*" (Emphasis supplied.)

Section 13 (b) (5) provides for the assessment by the State Tax Commission of tangible personal property belonging to any corporation.

Section 14 reads in part as follows:

"Except as hereinafter provided: \* \* \* (b) (2) All personal property directed in this article to be assessed, shall be assessed at the full cash value thereof on the date of finality."

Section 15 (a) provides, insofar as here relevant:

"The stock in business of every person, firm or corporation engaged in any manufacturing or com-

mercial business in this State shall be valued and
assessed to the owner thereof on the date of finality
at its fair average value for the twelve months pre-
ceding the date of finality. The term fair average
value as used in this section shall mean cost or mar-
ket value, whichever is lower * * *."

The appellees rely heavily upon Section 4 (c) reading as
follows:

"The owner of a life estate or other particular
freehold estate, or term for years perpetually renew-
able, in real or personal property shall be treated
as the owner of the property for purposes of ordi-
nary taxation, and shall be chargeable with the taxes
thereon. *The State Tax Commission is hereby au-
thorized to determine by regulations in what other
class or classes of cases a person in possession or
control, whether as lessee, custodian, consignee, bailee
or otherwise, of real or personal property of any
class or classes owned by another person shall or
may be treated by the State Tax Commission or
other assessing authorities as the owner of such prop-
erty for purposes of ordinary taxation. A person
who, pursuant to such regulations, is treated as the
owner of property owned by another person, shall
be chargeable with the taxes thereon, but if such
property is assessed separately from other property
of the person so treated as the owner, the collectors
may collect the taxes thereon either from the per-
son so treated as the owner or from the owner. A
person who, under this section or pursuant to such
regulations, is treated as the owner of property owned
by another person and pays the taxes thereon shall,
unless otherwise provided by private contract, ex-
press or implied, in fact or in law, have a right to
indemnity from the owner, and in the case of tangi-
ble personal property, a lien thereon for such taxes
while it remains in his possession or control.*"
(Emphasis supplied.)

The appellees also rely upon Regulation 10 adopted by the Commission on December 18, 1953, under the authority contained in Section 4 (c):

"Ownership of personal property—where title to personal property is in one person and possession or control of the same in another, as lessee, custodian, consignee, bailee, or otherwise, either the title holder or the person in possession or control shall be deemed to be the owner of such property for purposes of ordinary taxation."

The present case is apparently an outgrowth of *City of Detroit v. Murray Corp.,* 355 U. S. 489 (referred to below as the *Murray* case), and its companion cases, *United States v. City of Detroit,* 355 U. S. 466, and *United States v. Township of Muskegon,* 355 U. S. 484, all decided on March 3, 1958. The latter two cases upheld state taxation of the interest of a possessor of Government-owned real estate—in the *Detroit* case under a formal lease, and in the *Muskegon* case under permission, without any formal lease. In the *Detroit* case the lessee was using the property in the conduct of its private business; in the *Muskegon* case, the occupier was engaged in the performance of Government contracts, a fact which was held not to require a different result from that in the *Detroit* case. The *Murray* case, like the instant case, involved state taxation of the possessor's interest in personal property, legal title to which was held by the Government, and there, as in the *Muskegon* case, the property was being used in the performance of Government contracts, or to be more precise, sub-contracts (but this difference seems of no moment).

On the basis of these decisions and *American Motors Corp. v. Kenosha,* 356 U. S. 21, (affirming *per curiam* the decision of the Supreme Court of Wisconsin, reported in 274 Wis. 315, 80 N. W. 2d 363, on the authority of the *Murray* case), the power of a state and its political subdivisions to tax the interest of the possessor of Government-owned property seems clear, even though here, as in those cases, the economic burden

of the tax would fall upon the Government. Cf. *Alabama v. King & Boozer,* 314 U. S. 1; *James v. Dravo Contracting Co.,* 302 U. S. 134. The primary question before us, therefore, is not what this State can do, but what it has done.

Prior to the *Murray, Detroit, Muskegon* and *American Motors* cases, this Court had decided *Johns Hopkins University v. County Comm'rs.,* 185 Md. 614, 45 A. 2d 747; *Meade Heights, Inc. v. State Tax Comm.,* 202 Md. 20, 95 A. 2d 280; and *Westinghouse Electric Corp. v. State Tax Comm.,* 206 Md. 392, 111 A. 2d 661. In the *Johns Hopkins* case, under a research contract between the University and the United States, legal title to certain real estate paid for by the Government was vested in the University, but the Government could require its conveyance to itself or its designee at any time. On the authority of *United States v. County of Allegheny* (the *Mesta* case), 322 U. S. 174, this Court held that equitable title to the property was vested in the Government and that the Government's interest was exempt from State taxation.

In the *Meade Heights* case, the taxation of each of the appellant lessees' interests in apartment houses constructed on Government-owned land under 75-year leases was upheld. The leases provided that legal title to the buildings should be in the lessees, and they had the right to remove the buildings at the expiration of the leases. The leases provided that sub-leases should be made only to military personnel (with some exceptions) and at rentals approved by the Government. The assessments which purported to be at the full value of the buildings (but apparently were at a lesser amount) were found not to exceed the value of the lessees' interests therein. Congress had consented to the taxation of the lessees' interest in such cases. The *Meade Heights* case followed *Baltimore Shipbuilding & Dry Dock Co. v. Baltimore City,* 97 Md. 97, 54 A. 623, in holding that an interest less than an absolute fee was subject to taxation and that the State might tax such an interest, notwithstanding the existence of some rights in the property in the United States Government. That case was affirmed *sub nom. Baltimore Shipbuilding & Dry Dock Co. v. Baltimore,* 195 U. S. 375.

In the *Westinghouse* case, this Court upheld the taxation to Westinghouse of personal property in the possession of Westinghouse under two of four types of contracts with the Government, all of which are described at p. 397 of 206 Md. In brief, these four types were: (1) contracts which had been terminated, where title to the property manufactured thereunder vested in the United States; (2) contracts providing for progress payments and for the vesting in the United States of title to the property in its then state and thereafter, upon the making of a progress payment; (3) contracts providing for progress payments and for the creation of a lien on the property in favor of the United States upon the making of a progress payment; and (4) contracts providing for progress payments, but making no specific provision for vesting title in the United States or creating a lien in its favor upon the making of a progress payment. Both the Commission and the trial court held property manufactured under contracts of type (1) or type (2) exempt from State or local taxation because of the sovereign immunity of the Government. These holdings were not challenged in this Court, where the controversy concerned property manufactured under contracts of type (3) or (4). Such property was held taxable to Westinghouse as the owner and was held not to be covered by the immunity of the Government.

It will be noted that type (2) Westinghouse contracts were in general similar to the FP contracts of Martin, and that they were conceded in *Westinghouse* not to be taxable. None of the other three types of contract involved in Westinghouse is precisely or closely similar to either the FP or the CPFF contracts here involved.

Section 8 enumerating taxable property opens with a provision that such property *shall be subject to assessment to the owner and taxation for ordinary taxes.* (Italics supplied.) Section 9, enumerating exemptions, places the exemption in some instances on the ownership of the property, as in paragraphs (1) and (8); in some on its use, as in paragraph (4); in some on its ownership and use, as in paragraphs (5) and (8); in some on the nature of the property, as in

paragraphs (11), (12) and (30); in others on the avoidance of double taxation, as in paragraphs (14) and (15); and in paragraph (21) on the limitations upon taxation imposed by the Federal Constitution or statutes. Paragraph (21), quoted above, encompasses the exemption of property of the United States, except to such extent, if any, as taxation thereof may be permitted by the United States.

As was said in *Meade Heights* (202 Md. at 28): "[I]t is perfectly clear that, in the absence of congressional consent, express or implied, a State cannot impose a direct tax upon property owned by the federal government or held for it. [Citing the *Johns Hopkins* and *Mesta* cases.] But it is equally clear that private interests in government property are taxable to their full value. [Citing the *Baltimore Dry Dock Co.* and other cases.]"

We think that under the title vesting and control clauses of the contracts, both of the FP and the CPFF types, the United States, rather than Martin, is the owner of the property here in question. The facts of the present case are very similar to those of the *American Motors* case as to FP contracts and of *General Dynamics Corp. v. County of Los Angeles*, 51 Cal. 2d 59, 330 P. 2d 794, as to both FP and CPFF contracts, which cases reached opposite results on this question. In *American Motors* the contractor was held to be the owner; in *General Dynamics* the contractors were held not to be. In the latter case, the Supreme Court of California declined to follow the *American Motors* case as to FP contracts primarily because of the provisions of such contracts giving the Government control over the acquisition and disposition of property (other than scrap). (330 P. 2d at 801.) Similar control exists under CPFF contracts. As to such contracts— and the same appears to be true under FP contracts as well— after a progress payment has been made, in the words of Traynor, J., in the *General Dynamics* case (330 P. 2d at 799), "[T]he contractor retained no beneficial interest [in the property] other than the right of use in carrying out its contract."

It is, we think, inherent in the secret nature of the products here involved that the title clauses in favor of the Gov-

ernment are not mere legal formalities and that even such limited power of disposition as Martin might have as to surplus or scrap material or to dispose of material in the event of termination of a contract would bear little relationship to the full power of disposition which is usually an attribute of ownership. We should suppose that Government control over such dispositions as it might permit would be real and would be exercised rigorously. Doubtless such considerations are among those which have led the parties to one point of common ground—that the property in question has no market value and that, as a result, any valuation for tax purposes would have to be at cost.

We have not overlooked the statement in Martin's prospectus of November, 1958, pertaining to an issue of debentures, in which, under the caption "Purpose of Issue," reference was made to Martin's increased investment in inventories. Nor have we overlooked a footnote to Martin's comparative consolidated balance sheets headed "Inventories." This note is appended to an item under "Current Assets" consisting of "Materials, labor and other costs incurred on contracts in progress * * *." The footnote, *inter alia,* called attention to the fact that title to inventories in stated substantial amounts had passed to the United States Government as consideration for progress payments. We do not think that these statements as to inventories amount to any such claims or admissions of ownership in Martin as to overcome the terms of the contracts.

In the *Murray Corporation* case, it seems to have been assumed in the Supreme Court that title was in the Government, and it was held that the Michigan statute and the city ordinance there involved authorized the taxation of the contractor's right to use and possess the property, and these rights were held subject to taxation. In view of this holding the affirmance by the Supreme Court of the judgment of the Wisconsin Supreme Court in the *American Motors* case on the basis of the *Murray Corp.* case did not, we think, necessarily rest upon the Wisconsin holding as to ownership.

Ownership is often spoken of as a bundle of rights. Cer-

tainly, rights to possess and to use property are important parts of the bundle, but plainly they may be transferred by the owner to another without divesting himself of ownership. That, we think, is the case here, as it was in *General Dynamics*, and this leads us to the question here, which is very similar to one in that case, do our statutes tax such interests as those of Martin in Government-owned property?

On this question the appellees rely heavily on Sec. 4 (c) and Regulation 10 issued thereunder. The Regulation can rise no higher than its source, the statute. The statute, we think, is essentially a rule of convenience for the tax authorities and does not impose new taxes on separate interests in property. The corresponding Section of Article 81 of the 1939 Code (Sec. 3 (c)), as amended by Ch. 912 of the Acts of 1941, so as to add the portion which we have italicized, was not so much as referred to in this Court's opinion in the *Johns Hopkins University* case. In the *Meade Heights* case it was said (202 Md. at 27-28) that it "merely allows the person in possession to be taxed on the whole interest, where the whole interest is taxable, for the convenience of the tax authorities." This is in accordance with the recommendation of the Maryland Tax Revision Commission of 1939, pp. 121-123, upon which the Act of 1941 was based. This view of this statute was reiterated in *Alban Tractor Co. v. State Tax Comm.*, 219 Md. 593, 601, 150 A. 2d 456, where it was said: "The plain language of § 3 (c) [now 4 (c)] * * * indicates that its purpose was to permit the Commission to assess certain persons not the actual owners but who are in possession or control of property as if they were the owners." There, as here, the Report of the Tax Revision Commission of 1939 was cited. The decision in the *Murray Corporation* case may have opened a door previously thought closed (cf. the *Westinghouse* case above cited), but it did not rewrite Sec. 4 (c). The provisions for taxation of property to persons in possession thereof added to that Section in 1941 are predicated upon the assumption that the property in question is taxable to the owner. The *Meade Heights* case states such a basis for the Section, and the provision giving the tax-pay-

ing possessor a lien against the owner so indicates. We find no provision in Section 4 (c) or elsewhere for the taxation of limited interests in personalty to the respective owners thereof. We conclude that our tax laws applicable to the years in question did not provide for the taxation of Martin's right to use and possess personal property belonging to the United States. Our holding, we believe, is in accord with that of the Supreme Court of California with regard to similar tax statutes of that State involved in the *General Dynamics* case, though it is true that the California Court placed a good deal of emphasis on the difference between the statutes relating to the taxation of real property and of personal property. Those differences exceed those of our statutes. The statutory history and previous construction of Section 4 (c), as amended in 1941, are important factors in leading us to the view that the holding of the California Supreme Court is more persuasive than the construction of the Michigan tax laws involved in the *Murray Corporation* case and its companion cases as to our statutes.

Our attention has been called to the passage of a bill by the General Assembly after the argument of this case (S. B. No. 78, Ch. 884 of the Acts of 1961) dealing with the subject matter here involved, but not for the year in question. The Bill was apparently introduced to insure the taxability of such property after January 1, 1960, but before enactment was so amended as to produce a quite different result. We do not find it enlightening as to the proper construction of the law applicable to the year 1958, and do not rest our opinion on it.

In view of the conclusion which we have reached we do not find it necessary to express an opinion on the question of possible discrimination against the Government on the basis of either statutory provisions or actual tax administration. Of course, no such discrimination would be permissible. *Phillips Co. v. Dumas School Dist.*, 361 U. S. 376; *Moses Lake Homes v. Grant County*, 365 U. S. 744. Nor do we reach the interesting and by no means simple accounting questions involved in the case. (Cf. *Duple Motor Bodies Ltd. v. Inland*

*Revenue Commissioners*, H. L., [1961] Weekly Law Repts. 739, an income and profits tax case, involving a manufacturer's cost accounting relating to work in progress under customers' orders.)

In accordance with the views above expressed, the order of the Circuit Court is reversed, insofar as it affirms assessments against Martin for taxes upon it as the owner, or as if it were the owner, of materials, work in process and finished products in its possession under contracts with the United States; and the case is remanded for the entry of an order in accordance with this opinion.

> *Order reversed and case remanded for the entry of an order in conformity with this opinion; the costs to be paid by the appellees.*

HAMMOND, J., filed the following dissenting opinion:

Inasmuch as the Legislature has amended the applicable law, no good purpose would be served by stating at length the reasons for the views that cause me to dissent. Suffice it to say that I think the order appealed from should be affirmed for the reasons set forth by Judge Sodaro in his opinion below.