In the Matter of the UNITED STATES OF AMERICA, Appellant-Respondent, *v.* TAX COMMISSION OF THE CITY OF NEW YORK, Respondent-Appellant.

First Department, December 17, 1964.

*Laurence Vogel* of counsel (*Arthur S. Olick* and *I. Henry Kutz* with him on the brief; *Robert M. Morgenthau, United States Attorney,* and *Patricia A. Garfinkel*), for appellant-respondent.

*James J. McGowan* of counsel (*Edward J. McLaughlin* with him on the brief; *Leo A. Larkin, Corporation Counsel,* attorney), for respondent-appellant.

BREITEL, J. These are cross appeals from a determination, after trial before the court alone by Special Referee, in a tax certiorari proceeding. The determination reduced the assessments. But the result was achieved by first increasing the assessments and then deducting a sum greater than the allowed increase for a portion of the property found by the court to be exempt from local taxation because it was Federal property. Petitioner government tenant contends that the court had no power to increase the assessments and that the improvements

made by the government tenant were exempt from local taxation, and urges that the assessments be further reduced. The city contends otherwise and urges reinstatement of the assessments without diminution.

The primary issue is whether a substantial renovation of an old building by the government tenant under a renewable long-term lease created taxable or exempt additions to the property under the United States Constitution as property of the United States. The lease agreements between the owner landlord and government tenant provided that title to the improvements should remain in the government tenant. Secondary issues relate to the power of the court to increase assessments and whether, on any view, the assessments of the taxable property were excessive on the tax status date.

The determination should be modified and the assessments reinstated. The lease agreements were not effective to provide an exempt status for the building improvements, as Federally owned property and, in any event, the assessments on the tax status date were not in excess of the then value of the admittedly nonexempt property.

The premises involved contain an 1884 or 1888 building and a 1910 adjunct on 14th Street in Manhattan, its last use being as part of a department store complex of adjoining buildings. In 1958 the government took a 10-year lease to the property renewable at its option for two additional 5-year terms. The rent reserved was $150,000 or $160,000 per year, depending upon whose version is accepted as to the significance of a supplementary agreement executed by the landlord and government tenant some months after the original lease had come into being. Landlord was to provide heat, structural repairs and pay the local real estate taxes levied on the then current total assessment of $810,000. The government tenant was to bear the risk and burden of increased taxes imposed by reason of any increased tax assessment.

Under the lease agreements the government was entitled to make substantial improvements, subject to the approval of the landlord, not to be unreasonably withheld. The improvements were declared to remain the property of the government and, at the termination of the lease as extended, would be purchasable at the sole option of the landlord within a 60-day period from termination for the price of one dollar. No right of removal in the tenant was expressly reserved, and no unilateral right to make any change in improvements was reserved. Under the insurance clause the proceeds, in various contingen-

cies, inured to the benefit of the landlord or were to be applied to the rebuilding or repair of the landlord's building.

The government tenant's purpose in taking the leased premises was to reconstruct it as a modern office building with auxiliary facilities for the Army and Air Force Exchange Service. The government made about $1,000,000 worth of improvements in the building, completely reconstructing it, except for foundation, shell, and frame. A new facade was added. The result was an air-conditioned, modern building in which the original basic structure is completely concealed from view. Just prior to the lease and government reconstruction, the landlord had made substantial improvements in preparing the building for rental. The cost of the landlord's prior improvements is not disclosed by the record but they were structural and must have increased the value of the building.

The tax years involved are for 1959–1960, 1960–1961, and 1961–1962. The total assessment for each of the years was $1.3 million. The earlier assessment reflecting the value of the old building, and reflected in the tax clause in the lease agreements, was $810,000. It is immediately evident that the total assessments for the years in suit do not purport to charge the building with an increase in value equal to the cost of the improvements by the tenant.

The trial court reduced the land value from $480,000 and $470,000 to a uniform $440,000 for each of the taxable years. It increased the building values from $820,000 and $830,000 to $1,000,000, thus effecting a net increase in the total assessments to $1,440,000. From these total revised assessments it deducted $250,000 as the value of the government-made improvements which it held to be exempt from local taxation. This left a net taxable assessment of $1,190,000 for each of the taxable years. In short, it found that the assessors had undervalued the improved building but had erred in not exempting the Federally owned portion. Because the newly found net taxable assessment (net, because after the deduction of the exempt Federally owned portion of $250,000) of $1,190,000, was below the commission assessed total assessment of $1,300,000, the court directed a reduction in " assessments ", and thereby, the amount of taxes to be paid.

The trial court was without power to increase the assessments (*People ex rel. City of N. Y.* v. *Keeler,* 237 N. Y. 332, 334; *People ex rel. Kemp Real Estate Co.* v. *O'Donnel,* 198 N. Y. 48, 51–53). The city does not seriously meet or contest this contention, urging as an argument that within a total over-all

assessment the court may adjust the allocation between land and building (citing, e.g., *Matter of Pepsi-Cola Co.* v. *Tax Comm. of City of N. Y.,* 19 A D 2d 56, 61). That, of course, is not the situation in this case. The assessment of total value was increased before the exemption was allowed.

On the primary issue in the case there is no doubt that as between landlord and tenant there is, generally, substantial power by agreement to separate the title or property interests in the improvements added to or placed on the land. In another but related context this power was extensively discussed by this court (see *Matter of National Cold Stor. Co.* v. *Boyland,* 16 A D 2d 267, affd. 12 N Y 2d 808).[1] At the same time a caveat was expressed thus (p. 275): "A caveat is suggested. As with all things, concepts may not be confused with mere words, which are but symbols. Consequently, if an agreement between landlord and tenant should provide that the tenant is the owner of the building, such fact alone would not, in all cases or for all purposes, be absolutely conclusive. If the agreement conferred no incidents of ownership whatsoever upon the tenant then the provision might well be held meaningless and unavailable for all or for some purposes, including, perhaps, that of taxation on real property."

The conditions contingently there described spring to reality in this case. Except for the verbal reservation of title in the government tenant to the improvements made by it, there is no incident of ownership retained.[2] It is, however, not only what the parties say they agreed to, but in fact what they did agree to. There is nothing retained by the government tenant with respect to the improvements which it would not have merely as a tenant for a term of years. There is nothing yielded by the landlord which it would not have as owner to the improvements to its building, except that it must exercise an option within a 60-day period and pay one dollar. There is no provision in the lease agreements for what is to happen if the option is not exercised. There is no provision for the tenant to restore the premises to their prior condition — a futile and impossible thing on any view. There is no power to remove the landlord-

---

1. Indeed, the *National Cold Stor.* case exemplifies the power to separate ownership between landlord and tenant, in the context of a tax case, but with significant incidents of ownership, expressly referred to and discussed, retained by the tenant. The discussion there is highly relevant, but no useful purpose would be served by a repetition here.

2. The entire provision with respect to title reads: "All alterations, decorations, installations, additions or improvements in or to the demised premises shall be and remain the property of the Tenant."

rejected improvements.[3] There is nothing for the government to do except to abandon the landlord rejected improvements, and there is nothing for the landlord to do except to accept the tenant abandoned improvements, remove them, or abandon its land and what is on it.

Such an option is not a reality as a legal construction or as a reflection of possible human conduct. It is a mere verbalization, with hopeless contradiction too, without anchor in legal theory or the order of nature. The only legal meaning it can have is that the improvements are not to be taxed because the parties say so, and they say so by calling it Federal property, although there is no other incidence, fact, or legal consequence which distinguishes it from the landlord's private property from which it is physically and also legally inseparable.

In so holding it is recognized, as the government argues, that the rights to exemption do not depend upon the New York law of fixtures and that it would be possible for a landlord and tenant to have a joint ownership, in whatever shares they agreed, or some other kind of shared or participating ownership, to improvements or a building. But it is also true that, while legal rules need not reflect precisely the order of nature, they may not be so divorced from reality or legal theory, that their consistency or nexus with external facts and larger legal doctrine is utterly absent. The ownership in the improvements in this case is all but in name a nonownership as the option is in all but name a nonoption. They are self-neutralizing contradictions.

In support of its argument that Federal law rather than the State law determines the nature of the ownership to property being subjected to taxation the government cites *Matter of ACF Ind.* v. *Board of Assessors of City of Buffalo* (13 A D 2d 154, affd. 14 N Y 2d 539). The authority is quite supportive of the government's assertion, about which there is no dispute. But the case is also valuable in emphasizing that it is beneficial

---

3. In its reply brief the government quotes a provision of the lease not included in the abbreviated exhibit in the record: " End of Term 18. Upon the expiration or other termination of the term of this lease, Tenant shall quit and surrender to Landlord the demised premises, broom clean, in good order and condition, ordinary wear excepted, and Tenant shall remove all of its property. Tenant's obligation to observe or perform this covenant shall survive the expiration or other termination of the term of this lease."

If this provision was intended to cover more than movable fixtures expressly excepted from the landlord's option then it imposed an impossible burden on the government. Its improvements were inseparable from the foundation, shell and frame of the building in which title remained, concededly, in the landlord. On the other hand, if the clause is read to relate to movable fixtures expressly excepted from the landlord's option it makes sense and is performable.

ownership and not the bare legal title, nominally declared, which is controlling. Thus, Mr. Justice HALPERN, on behalf of the court, said (p. 157): ''We may agree with the city that the legal title of the building was still in ACF, the Commission having elected not to have the title transferred to it pending the sale. But this was not controlling. The crucial question was who had the beneficial ownership, not who had the legal title. 'We believe that the appropriate test would turn on practical ownership of the property rather than the naked legal title' (*Rohr Aircraft Corp.* v. *County of San Diego,* 362 U. S. 628, 634). The *Rohr* case is directly in point and establishes the immunity from taxation of the building here in question. (See, also, *Hopkins Univ.* v. *Board of County Comrs.,* 185 Md. 614.) '' True, in that case the reasoning resulted in holding that the property in suit had retained its Federal character despite the pretended separation of title from the beneficial ownership; but this is reasoning which is reciprocal and applies when the pretended separation of legal title from beneficial ownership leaves the beneficial ownership in the landlord rather than the government (see, *id.,* esp., p. 158).

Consequently, it is concluded that the government tenant failed to retain any ownership, certainly any beneficial ownership, in the vast improvements it made in the subject building. Since these improvements were at a cost of about $1,000,000 and the landlord concededly made some improvements of its own before the lease agreements were made, the old assessment of $810,000 no longer reflected the value of the property. While the government expert testified that the improvements increased the value by only $250,000, the city's testimony assigned a much greater value based upon a rental value of $2.50 per square foot. Whatever the correct square-foot rental value is, it must have increased considerably beyond the agreed rental value of the old building. If it were only $2 per square foot, as will be seen later, the capitalized value would exceed the total assessment, and by even greater amounts, as the square-foot rental value would approach the city expert's estimate. If the city testimony is credited, even if only in part, the assessments should be reinstated.

Assuming, *arguendo,* that the foregoing analysis were not available, reinstatement of the assessments is required for alternative and equally strong reasons. The economic rental value of the old unaltered premises, even on theories urged by the government witness taken in conjunction with the rentals reserved in the lease agreements supports the assessments.

The building, before the lease and the government improvements were made, contained a rentable area of about 100,000 square feet. The rent reserved in the lease agreements, taking either figure of $150,000 or $160,000, yields a gross annual rental rate of $1.50 or $1.60 per square foot. This rental, after deducting real estate taxes, insurance, heat and structural repairs which the landlord was obliged to bear or supply, would yield a return of 7.9% or 8.7% on the total assessment of $1,300,000, an adequate rate of return indeed on 14th Street property.[4] Only if it could be argued, as it is not, that the government paid an excessive rent can a capitalized value thus derived from the net return at a rate of 7.9% or 8.7% be undermined (see, generally, *People ex rel. Gale* v. *Tax Comm. of City of N. Y.,* 17 A D 2d 225, 229–230).

The city's expert estimated the proper rate for capitalization of the assessed return from the premises at 7½% overall, that is, for land not subject to depreciation and the building subject to depreciation. The government expert, on the other hand, assumed a 6½% rate as "interest" and an additional 2½% rate as depreciation for the building alone. This yields an 8.2% rate overall. The government's proof, to be sure, related to the renovated building, while the city's expert gave his testimony on the basis of the reserved agreed rental.

With respect to a prime commercial building this court has had occasion to discuss applicable rates of capitalization (*Matter of Seagram & Sons* v. *Tax Comm. of City of N. Y.,* 18 A D 2d 109, 112, 114, 116, affd. 14 N Y 2d 314). In such case, i.e., a prime building, the rates accepted for the building alone were 6% plus 2% for depreciation. The higher rate applicable to this building, before renovation, on 14th Street is, of course, explained by the fact the old building in suit was not a prime property, and 14th Street is not comparable to Park Avenue just north of Grand Central Terminal (for the influence on rates of capitalization by factors of poor neighborhood, inadequate improvements, and obsolescence, see, generally, *Matter of City of New York* [*Madison Houses*], 17 A D 2d 317, *passim,* but esp. pp. 323–324). In any event, the actual rate of return on the total assessment fixed by the assessors is well within the range of the conflicting limits set by the experts,

4. The government's expert estimated insurance at $500, heat at $8,500, structural repairs at $3,500, for a total of $12,500. The real estate taxes would average $34,180 for the part the landlord was responsible on the old assessed value of $810,000. These items would aggregate $46,680. To compute the rate of return it is necessary only to deduct these items from the rent of $150,000 or $160,000, and divide the resultant net annual incomes by the new total assessments of $1.3 million, and the quotient is a rate of 7.9% or 8.7%.

and thus more than justifies the total assessment (*Matter of City of New York* [*A. & W. Realty Corp.*], 1 N Y 2d 428, 433).

On the analysis last made the government improvements are completely disregarded, but the arm's length negotiation for the leasehold is fully credited (cf. *People ex rel. Gale* v. *Tax Comm., supra,* pp. 229–230). Even this is done without giving effect to the deferred rental value to be received by the landlord when, after perhaps 20 years, it will receive the renovated building, albeit subject to the depreciation of the intervening years, and without giving effect to the influence of having a truly prime tenant.

So that there be no confusion it should be remarked that the government expert assumed that the rental value of the building, as renovated, was at the rate of $1.60 per square foot. This figure is identical with that derived from the actual rent of $160,000 for the old building reserved under the lease agreements. It is noteworthy, however, that if this expert was correct, then the government improvements added nothing to the rental value of the building. This, of course, must be non-sensical, even if one accept that the government was renovating for its own use and not for profit. The only way the government expert could be right would be if the government had agreed to pay landlord an excessive rental, namely, the $1.60 per square foot for the old building, and that the fair rental for the premises was substantially less. This, he said, in effect, when he testified that the rental value of the building before the improvements was $120,000. But this post-factum downgrading of the wisdom of the lease agreements should not be credited.

So, whichever way one turns in this case, the total assessments as fixed by the assessors are more than justified. If indeed the improvements are fully taxable, but of course only in terms of having increased the rental value (perhaps only by less than 25% of the added expenditures for the improvements as contended by the government) and not to the extent of their cost, then the total assessments are inadequate, but the court is without power to increase them.

Accordingly, the order should be modified, on the law and on the facts, and the assessments should be reinstated, without costs to any party.

BOTEIN, P. J., VALENTE, MCNALLY and STEVENS, JJ., concur.

Order, entered on January 31, 1963, unanimously modified, on the law and on the facts, and the assessments reinstated, and, as so modified, affirmed, without costs to any party.