### BURTON, REC'R OF AMERICAN GUARANTY CORP. *v.* TATELBAUM, REC'R OF BROOK-WOOD FARMS, INC.

[No. 292, September Term, 1964.]

*Decided November 8, 1965.*

The cause was argued before PRESCOTT, C. J., and HAM-
MOND, HORNEY, MARBURY and BARNES, JJ.

*David Ross,* with whom were *Alexander Harvey, II* and
*Ober, Williams & Grimes* on the brief, for appellant.

*Mitchell Stevan,* with whom were *Sagner, Stevan & Harris,*
and *John G. Rouse, Jr.,* on the brief, for appellee.

HAMMOND, J., delivered the opinion of the Court.

In the midst of booming economic prosperity, the receivers
of two financially ailing corporations are at each other's legal
throats in a struggle to establish title to chattels which had
been leased by one of the corporations to the other.

Between June 1960 and February 1962 American Guaranty
Corporation of Rhode Island, which did business in many
states, transferred to Brookwood Farms, Inc., a roadside res-
taurant in Anne Arundel County which specialized in ice cream
and other dairy products, the right to possess and use for stated

periods a number of pieces of personal property. The transfers were evidenced by twenty separate writings signed by both parties. Brookwood first needed new equipment and then money, and six of the later written leases covered property on its premises which it had sold to American Guaranty but physically retained under a lease back, and the other fourteen leases covered equipment such as walk-in ice boxes, freezers and compressors which American Guaranty had bought new from suppliers and leased to Brookwood.

All the leases were in substantially identical form. Their initial terms were for five years at monthly rentals equalling 2.2% of the purchase price of the piece of equipment leased; so that during the five-year terms the lessor would recover its initial investment and a gross profit of thirty-two per cent. Each lease renewed itself "from year to year" unless thirty days' notice of cancellation was given by the lessee. In seventeen of the leases the renewal rental for a year was the amount of the previous monthly rental; in the other three the annual renewal rent was twice the previous monthly amount.

Each lease provided that upon its expiration or earlier termination, the lessee should return the leased equipment to the lessor in good order and repair, ordinary wear and tear excepted, and that "the Equipment is, and shall at all times be and remain, the sole and exclusive personal property of LESSOR; and the LESSEE shall have no right, title or interest therein or thereto except as expressly set forth in this Lease." The leases also stated that "the LESSEE will attach such labels or other identifying marks as the LESSOR may reasonably request to indicate that the Equipment is owned by the LESSOR."

There was a further provision that upon default in payment of rent for ten days, or after ten days' notice of the filing of a petition under the bankruptcy laws or the execution of an assignment for the benefit of creditors, the lessee's "* * * right to possession of the Equipment shall terminate and the LESSOR shall be authorized to take immediate possession * * *."

Each lease had on its face a blank space under the heading "Additional Provisions." In one lease that space contained a

certification of title to the leased property; in another a statement that the lease superseded earlier leases; and in a third the space was blank. In seventeen of the leases the space bore the notation "None."

In January 1964 the Circuit Court for Anne Arundel County appointed a receiver for Brookwood and dissolved it. Although the leases had been in default for some time, Brookwood's receiver refused to accede to American Guaranty's demand for the surrender to it of the leased property and filed a petition in the Circuit Court requesting a ruling that Brookwood had owned the leased articles and that they were free of any claim of American Guaranty. After a hearing at which he received parol and other extrinsic evidence of the intention of the parties and the meaning of the leases, Judge Duckett ruled that "* * * the so-called equipment leases were in fact not bona fide leases" and ordered the receiver of Brookwood to sell the properties free of lien or claim under the leases and hold the proceeds for the benefit of general unsecured creditors, including American Guaranty, whose receiver appealed the order.

Discussions in Volume 1 of the 1962 University of Illinois Law Forum; in an article titled *Acquisition of Industrial and Commercial Equipment Through Leasing Arrangements,* 66 Yale Law Journal 751; and in a Note in 44 Boston University L. Rev. 103 show these facts, among others, as to equipment leases:

The business of leasing equipment to industrial and commercial users has grown rapidly in the last two decades and presently is engaged in by a number of large corporations, with rentals running into hundreds of millions of dollars a year. In the earlier stages of equipment leasing there often was a federal income tax advantage to the lessee, who could deduct the payments of rent from ordinary income and thus enjoy the benefit of securing equipment to aid in producing income without buying the equipment and at the same time have the federal government, in effect, pay approximately half the rent. The federal tax gatherers soon took a dim view of this and, after amendments to the law and regulations, in many instances required equipment leases to be considered, for tax purposes, as

conditional sales or contracts of sale so that the lessee would be treated as the owner and could only depreciate the equipment and not deduct rent paid for it as a business expense. The federal courts sometimes have upheld the tax gatherers as, for example, in *Starr's Estate v. C. I. R.*, 274 F. 2d 294 (9th Cir. 1959), and *Mt. Mansfield Television, Inc. v. United States*, 239 F. Supp. 539 (D. Vt. 1964), *aff'd*, 342 F. 2d 994 (2d Cir. 1965), although the United States Court of Appeals for the Eighth Circuit held to the contrary in *Western Contracting Corporation v. C. I. R.*, 271 F. 2d 694, 701-02, saying:

> "* * * this record is barren of probative evidence affording proof that the lease agreements did not express the true intent of the parties at the time they were entered into. Indeed, the Tax Court found, 'It is true, as petitioner contends, that none of the agreements involved here contained options to purchase. Furthermore, witnesses, including five representative dealers, testified that petitioner was under no obligation and had no vested right to purchase the equipment in controversy at the end of the so-called lease term.'
>
> * * *
>
> "In a proper case, the economic factors of the situation may be important in interpreting an agreement, and in arriving at the intent of the parties, but there is no legal basis here for holding, as the tax court in effect did, that such factors and circumstances can make a new agreement for the parties."

See also *Benton v. Commissioner of Internal Revenue*, 197 F. 2d 745 (5th Cir. 1952), at 752.

Thus the tax advantage to lessees of equipment leasing have largely vanished or have come to be regarded as so hazardous or unlikely of success as not to be attempted. Nevertheless, the practice of equipment leasing still flourishes and grows because of the practical and psychological and economic advantages and flexibility it affords the lessee and the profit it gives the lessors.

Text writers and state and federal courts have agreed that where it appears clearly that the parties intended a lease and

not an immediate or ultimate sale or a right to acquire title or the accumulation of an equity in the leased property, the apparent intention of lessor and lessee will be given effect, particularly where the terms of the lease do not include the conferring upon the lessee of a right or an option to acquire the leased equipment as owner. See 2 Williston, Sales §336 (rev. ed. 1948). In *Tishman Equipment Leasing, Inc. v. Levin,* 202 A. 2d 504, 507-08 (Conn.), the question was, as here, whether the leasing corporation could recover its property from the trustee in bankruptcy of the lessee, and the Connecticut court said:

> "The facts found by the trial court give adequate support to its conclusion that the transaction in issue is a lease. The document executed by the parties explicitly provided for retention of title by Tishman, the delivery of possession to Underwood, and Underwood's obligation to pay a monthly rental for a specified term with an option to renew. There was no provision in the agreement by which Underwood could, under any circumstances, obtain title or require Tishman to convey title. See General Statutes § 42-83(e). In the event of a default or a failure to renew at the end of the term, Underwood was obligated to relinquish possession of the property to Tishman. In addition, the market value of the machinery would have been 90 percent consumed during the term of the agreement owing to obsolescence, so that Tishman was being compensated for the use, rather than being paid the purchase price of the machinery. See Western Contracting Corporation v. Commissioner of Internal Revenue, 271 F. 2d 694, 700 (8th Cir.) ; Blumenthal & Harrison, 'The Tax Treatment of the Lease with an Option to Purchase,' 32 Texas L. Rev. 839, 857."

See also *American Can Company v. U. S. Canning Corp.,* 180 N. Y. S. 2d 983 (App. T. 1958), *aff'd,* 193 N. Y. S. 2d 986 (App. Div. 1959), and compare *Da Rocha v. Macomber,* 116 N. E. 2d 139 (Mass. 1953), and *Allen v. Cohen,* 310 F. 2d 312 (2d Cir. 1962). The Maryland cases of *Beckwith Mach.*

*Co. v. Matthews,* 190 Md. 182, *Alban Tractor Co. v. Tax Comm.,* 219 Md. 593, and *United v. Potts & Callahan,* 231 Md. 552, all involved writings conferring an option in the transferee to purchase the transferred property from the transferor and are not particularly helpful here.

All of the factors relied on in *Tishman* are present in the lease arrangements between American Guaranty and Brookwood. (American Guaranty seemingly depreciated the leased property during the initial terms of the leases to a total of eighty-seven and one-half per cent of its cost.) The leases, in the light of circumstances existing at the time they were executed, are clear and unambiguous. Brookwood was not given by the leases as written either the right or the option to acquire title to, or an equity in, the leased equipment. Having found that the contracts of lease were binding agreements which clearly reflected the intent of the parties and were free of claims of fraud, mistake or illegality of purpose, there was no need to consider evidence extrinsic of the writings and it was improper to do so over the timely objections which were made. *Glass v. Doctors Hospital,* 213 Md. 44, 57-58; *Whitney, Exec. v. Halibut,* 235 Md. 517, 527-28; Annot., 57 A.L.R. 2d 1076 (1958).

If the extrinsic evidence which was received by the trial judge over objection is considered, the lessee is not helped. The "understanding" which Brookwood's vice-president, who acted for it in the making and execution of the leases, said he had was that after ten years "* * * we could then purchase the equipment for whatever the agreed upon value would be between ourselves and American Guaranty;" each case would have to be decided differently. Long after all the leases had been executed, American Guaranty's Maryland sales representative wrote Brookwood that the "buy-out" price of leased equipment would be a negotiated one during the initial term and thereafter would be lower than the depreciated value of the equipment shown on the schedule enclosed (twelve and one-half per cent of its cost) but would not be more.

It was shown by Brookwood's receiver that American Guaranty carried the leased equipment on its books as assets. It paid federal income tax on the rental payments received on the theory that they were rents and not instalments on account of a

purchase price. When, during the terms of the leases, Brookwood sold its milk business to a dairy, the buyer took over some of the leased equipment as part of the deal and, not wanting to continue the leases, bought it from American Guaranty at a negotiated price. Brookwood neither asked for nor received any part of the purchase price. American Guaranty, as part of its regular course of business, made leases with options to purchase as well as those without, and it seems conceded that had Brookwood requested purchase options they would have been granted and, with suitable adjustments of rentals, have been noted in the box in the leases marked "Additional Provisions." No such request was ever made by Brookwood. It is true that Brookwood's accountant said that the leases were carried on its books as notes payable and suggested it took depreciation on the leased equipment in its tax returns, rather than deducting the rental payments, but it was not shown that this had been Brookwood's intent and purpose at the time of the making of the leases and it may well be that its accountant became overawed by the federal tax people and the court decisions which supported their maximum tax gathering point of view.

Brookwood's receiver argues earnestly that the "practicalities of the situation" and "the factors of economic necessity" combine to establish that the leases, despite their explicit provisions, were either conditional sales, or contracts to sell, or secured loans. He cites Brookwood's obligation under the leases to repair and maintain the equipment, to bear the risks of loss or damage, to pay property taxes on the equipment and the fact that some of the equipment was so attached to the realty as to be likely to become fixtures, as well as arguing that after it had paid one hundred thirty-two per cent of an article's cost in five years and could then acquire it for twelve and one-half per cent of that cost, it would become an economic necessity for Brookwood to buy it. The answer is, we think, that all of these matters were known to the contracting parties when they entered into the leases and they chose to agree in clear and unambiguous language that there would be leases of, not sales of or rights to purchase, the property transferred. The lessor chose to impose conditions and obligations as to the

leased property which were legal and, indeed, not illogical, in such a lease of personal property and the lessee knowingly and voluntarily chose to agree to those conditions and obligations. That the parties did so choose to so agree did not transform a lease into a sale. 2 Williston, *op. cit. supra* at §336. As the Court said in *Western Contracting, supra* at 702: "* * * there is no legal basis here for holding * * * that such factors and circumstances can make a new agreement for the parties."

> *Order reversed, with costs, and case remanded for further proceedings appropriate under the aforegoing opinion.*