In the Matter of the **ATLANTA TIMES, INC.**, Bankrupt.

No. 53301.

United States District Court
N. D. Georgia,
Atlanta Division.

Oct. 12, 1966.

Hansell, Post, Brandon & Dorsey, Atlanta, Ga., for bankrupt.

Powell, Goldstein, Frazer & Murphy, Atlanta, Ga., for Walter Sanders, trustee and receiver.

Harmon & Thackston, Atlanta, Ga., for National Acceptance Company of America.

Edenfield, Heyman & Sizemore, Atlanta, Ga., for Commercial Credit Corporation.

MORGAN, Chief Judge.

Two petitions for review of the orders of the Referee dated May 23, 1966 and September 2, 1966, have been filed with this Court by the trustee. The Court has heard oral argument and has studied the very comprehensive briefs which have been submitted by both parties.

The Findings of Fact and Conclusions of Law contained in the Referee's orders of May 24, 1966 and September 2, 1966, fully set forth the issues raised by the petitions for review and are incorporated herein by reference.

The Court concludes that the orders of the Referee are correct, and the petitions for review should be and hereby are denied.

It is so ordered.

## FINDINGS AND CONCLUSIONS OF W. HOMER DRAKE, REFEREE.

The Court has before it several matters in the above-styled bankruptcy arising out of transactions between the bankrupt (hereafter called the "Times"), and Commercial Credit Corporation (hereafter called "CCC"). The controversy arises out of an Equipment Lease dated February 7, 1964 (hereafter called the "Lease").

## FINDINGS OF FACT

A.  Pleading.

1.  On September 1, 1965, the Times filed a petition for Arrangement under Chapter XI of the Bankruptcy Act.

2.  On September 7, 1965, CCC filed its petition for reclamation of property leased to the Times alleging default by the Times under the terms of the lease in discontinuing business and filing its bankruptcy petition. The trustee filed an answer alleging the lease was a security agreement as defined by the Uniform Commercial Code adopted in Georgia; that at the time of its execution the Times was given an option to acquire the leased property at the end of the term of the lease for a nominal consideration of "not more than $5.00"; and that no financing statement had been filed by CCC evidencing its security interest in the leased property.

3.  While the matter was pending, the property of the Times, including the property claimed by CCC, was sold at public auction, which sale was subsequently confirmed by the Court. The property claimed by CCC brought a net price, after auctioneer's commission and expenses of sale of $318,573.76, which amount now stands in lieu of the property from which the proceeds were derived.

4.  Following the sale, the trustee filed a Petition for Turnover against CCC alleging that a security deposit in the amount of $145,000.00 was held by CCC under the lease, and that CCC had not perfected its security interest in said deposit. CCC filed an answer denying its failure to perfect a security interest and praying for a set-off of the security deposit against the damages it allegedly suffered by the default of the Times under the lease.

B.  The Lease and the Leased Property.

1.  The lease between the Times and CCC was executed on February 7, 1964. Following its execution CCC purchased $570,116.10 of equipment which had been designated by the Times, (Trans. 2-9-66, p. 17), and the equipment purchased was invoiced to CCC and shipped to the Times. (See invoice attached to lease).

2.  The Times executed the lease knowing its contents and the lease in evidence is the lease the Times intended to execute (Trans. 2-9-66, p. 19; letter from Glick dated Feb. 7, 1964).

3. Upon execution of the lease the Times paid CCC $145,000 as a deposit to secure its payment and performance of any obligations under the lease. (Letter from Glick dated Feb. 7, 1964).

4. The lease is for a term of ten years and calls for a monthly rental of $5,940.61 per month. The first rental payment was made June 29, 1964, and the Times continued to make payments thereafter, the last payment being made for the rent due July 29, 1965.

5. Under the terms of the lease the Times assumed all responsibility for maintenance and repair of the leased property, was obligated to keep the property insured and assumed all risks of loss. All taxes and expenses in connection with the leased property were to be paid by the Times. The lease also provides that:

"(I)t is and is intended to be a lease, and Lessee does not hereby acquire any right, title or interest in and to the chattels, except the right to use the same under the terms hereof."

It contains a provision that:

"No representations, warranties, or agreements, oral or written, expressed or implied have been made by either party hereto with respect to this lease or the chattels covered hereby, except as expressly provided herein. This lease, together with the schedules from time to time attached hereto, constitute the entire agreement between the parties hereto. Any change or modification to this lease must be in writing and signed by the duly authorized representatives of the parties hereto."

At the expiration of the lease, the Times agreed to return the leased property to CCC or load it on board such carrier to be shipped to such destination as CCC should specify.

6. The lease contains a long and detailed default provision. The conditions of default include the filing of a petition under any Chapter of the Bankruptcy Act, and the suspension of business or commission of any act amounting to business failure. Upon default CCC is given the right to terminate the lease and demand a return of the property, or take possession of the property and thereafter hold it and the security deposit free and clear of the lease. CCC is authorized to re-let the property or sell it. If the property is re-leased, the total unpaid rentals less the rent from such leasing constitute liquidated damages. If the property is sold, the amount received less expenses and less the appraised value of the property at the end of the term is deducted from the total unpaid rentals and the balance is liquidated damages.

7. Most of the property leased was composing room equipment, including fourteen linotype machines. (Invoices attached to lease). The equipment does not wear out quickly and there was no possibility that it would be consumed during term of the lease. (Trans. 2–9–66; pp. 22, 41.) The property would have substantial value at the end of the lease term (Davis, p. 23).

C. Default.

1. On September 1, 1965, the Times filed its Petition for Arrangement under Chapter XI of the Bankruptcy Act. It ceased publication on that date and never resumed business thereafter. On January 17, 1966, it was adjudicated bankrupt.

D. Option.

1. The only matter of fact disputed by the parties is whether or not CCC granted the Times an option to acquire the leased property at the end of the term for a nominal consideration. The lease itself contains no option or any provision whereby title shall ever pass or be acquired by the Times. The written lease expressly negatives such option. Much evidence was tendered on this question, all of which was objected to by CCC. The Court received the evidence, subject to the objection. (See conclusion No. 1). Without adopting any of the evidence offered as part of its findings of fact, the Court herein sets out its understanding of the testimony:

a. Mr. Glick, Vice-President of CCC. He stated unequivocally that at no

time did CCC ever agree, either orally or in writing to give the Times an option to acquire the leased property, for a nominal consideration, or otherwise.

b. Judge Davis, Publisher and Chairman of the Board of the Times. He stated that at a conference prior to execution of the lease with Mr. Glick and Mr. I. M. Orner, Mr. Glick told him that at the termination of the contract, CCC "for a nominal sum would transfer title" to the Times. (Trans. 2–9–66, p. 13). When asked what was a nominal sum, he testified that Mr. Glick replied, "Oh, a thousand dollars or two thousand dollars." (Ibid. at p. 14). Judge Davis stated that the question was raised that, "on a transaction of this size, with just a verbal understanding here, there might arise some disagreement and we ought to have * * * The Atlanta Times ought to have some kind of a showing that when all this has been completed that the title to this property will be transferred to The Atlanta Times." Mr. Glick is said to have replied, "Well, after the contract is signed and after this transaction goes through, some appropriate officer of Commercial Credit Corporation will write you a letter to that effect." (Ibid. at p. 15).

Judge Davis testified that Mr. Glick did not state who the person would be that would write the letter. To his knowledge the letter was never written and to his knowledge it was never received. (Ibid. at pp. 15, 16).

c. Roscoe Pickett, President of the Times. (With reference to the testimony of Messrs. Pickett and Carter and Mrs. Stephens, counsel for trustee stipulated what they would testify to if called. Counsel for CCC objected to the admissibility of the testimony stipulated both on the grounds of the parol evidence rule, the hearsay rule, and rule against self-serving declarations. Counsel agreed, however, that if the testimony were admissible, the witnesses would testify as indicated.)

By stipulation, Mr. Pickett testified that he was present at the meeting with Glick, Davis and Orner, and that it was agreed that "at the end of the lease period the Times would have an option to buy the equipment which was the subject matter of the lease for a nominal consideration of $1,000 or $2,000," and that Mr. Glick stated that he "would have some appropriate official of Commercial Credit write a letter to the Times stating the option to purchase." (Stip. 4–25–66).

He also testified that "he has always been under the impression" that the letter was written and received, but the officers of the Times have been unable to locate it. (Ibid.)

d. James C. Carter, Comptroller of the Times. By stipulation, Mr. Carter testified that Mr. Orner showed him a memorandum regarding the lease which included an option to buy at the end of the term. (Ibid.)

e. Mrs. Arline G. Stephens, Mr. Orner's secretary. By stipulation, Mrs. Stephens testified that after the conference with Glick, Davis and Orner, Orner dictated a memorandum to her which stated that the Times would have an option to buy at the end of the lease period, and that the option would be incorporated in a "separate letter signed by an appropriate official of Commercial Credit Corporation." (Ibid.)

1. There is no evidence of any letter from CCC to the Times which purports to give the Times an option to acquire the leased property at the end of the term.

## CONTENTIONS OF THE PARTIES

A. The Trustee for the Times contends:

1. With reference to the lease,
(a) that it is a lease intended as security under Section 109A–9–102 of the Georgia Code, and CCC failed to perfect its security interest therein by filing a financing statement.

(b) that the Times had an option to acquire the leased property at the end of the term for a nominal consideration and this renders the lease a security agreement under Section 109A–1–201(37).

2. With reference to the security deposit,

(a) that it is personal property given to secure performance of an obligation that requires the filing of a financing statement to perfect a security interest therein.

B. CCC contends:

1. With reference to the lease,

(a) that it is a lease and only a lease and CCC's interest as lessor does not require a financing statement to preserve its rights to possession of the leased property upon default by the lessee.

(b) that the lease contains no option to acquire title by the lessee and the lease cannot be contradicted or varied by parol evidence.

2. With reference to the security deposit,

(a) that it is exempt from the operation of Article 9 of the Commercial Code by Section 109A–9–104 (g), but if not exempt, CCC's interest in the deposit was perfected by possession under Section 109A–9–302 and Sections 109A–9–305, 306.

## CONCLUSIONS OF LAW

A. Evidence.

■ 1. All of the testimony with reference to the existence of an option was objected to by CCC on the grounds that it sought to vary the terms of a written agreement contrary to the parol evidence rule. The lease expressly reserves title to the leased property in CCC, and provides that the Times has no right, title, or interest in the goods except the right of use. (See Fact 4). It also contains "an entire agreement" provision excluding any change or modification except in writing and duly signed.

The parol evidence offered seeks to vary the terms of the written agreement. The Times makes no allegation nor does the evidence suggest the existence of any fraud, mistake, or illegality of purpose. The written agreement is unambiguous. Under such circumstances, the rule is clear that the parol evidence offered is inadmissible and it is hereby so ruled.

In a very similar case, Burton, Receiver v. Tatelbaum, Receiver, 240 Md. 280, 213 A.2d 875, The Court of Appeals of Maryland held:

"The leases, in the light of circumstances existing at the time they were executed, are clear and unambiguous. Brookwood was not given by the leases as written either the right or the option to acquire title to, or an equity in, the leased equipment. Having found that the contracts of lease were binding agreements which clearly reflected the intent of the parties and were free of claims of fraud, mistake or illegality of purpose, *there was no need to consider evidence extrinsic of the writings and it was improper to do so over the timely objections which were made."* (Emphasis added.)

■ Under Georgia Law, the rule is the same as expressed by the Maryland Court. Where the written agreement also contains "an entire agreement" provision, it is conclusively presumed that the writing contains the entire agreement in regard to the subject matter. Barrie v. Smith, 105 Ga. 34, 31 S.E. 121; Red Line Products Co. v. J. M. High Co., 57 Ga.App. 304, 195 S.E. 296; Kiser v. Godwin, 90 Ga.App. 825, 84 S.E.2d 474.

The exceptions to the parol evidence rule urged by the trustee of the Times are not applicable to the circumstances of this case.

■ 2. Even if admissible, the testimony regarding the existence of an option to acquire the leased property fails of its mark. Taken in the light most favorable to the trustee, it would show no more than an expectancy, not legally enforceable. Neither Judge Da-

vis nor Mr. Pickett testified to the existence of the precise terms of an option, but rather stated it was to be at a price of $1,000 or $2,000. Their testimony acknowledges that the person presumably making such agreement had no authority to bind CCC since the agreement was allegedly to be committed to a writing signed by "an appropriate" person at CCC. At best, the testimony described a representation made by a person without authority to bind CCC of what CCC would be willing to do at a time ten years thence. The evidence offered by Mr. Carter and Mrs. Stephens has no probative value. In both instances, they seek to testify about self-serving declarations made by persons at the Times not in the presence of CCC.

The Court is compelled to note, as Judge Davis did in his testimony, that in a transaction of this magnitude, where disagreements could arise, parties would not rely on a verbal agreement. This is particularly true where, as here, we are dealing with knowledgeable parties, an event to occur ten years in the future, and a written agreement expressly providing that no other representations or agreements with regard to the subject matter have been made.

The Court concludes that the Times had no right or option to acquire title to the leased property for a nominal consideration.

3. Section 109A–1–201(37) defines a security interest as follows:

"Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation. The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer (109A–2—401) is limited in effect to a reservation of a "security interest." The term also includes any interest of a buyer of accounts, chattel paper, or contract rights which is subject to Article 9. The special property interest of a buyer of goods on identification of such goods to a contract for sale under 109A–2—401 is not a "security interest", but a buyer may also acquire a "security interest" by complying with Article 9. Unless a lease or consignment is intended as security, reservation of title thereunder is not a "security interest" but a consignment is in any event subject to the provisions on consignment sales (109A–2—326). Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

The intention of the parties must be determined from the language of the lease itself. Wheatland Electric Products Co., Inc., Bankruptcy, D.C., 237 F.Supp. 820 at 822. The lease states that it "is and is intended to be a lease." There is no provision under which the Times could ever acquire title to the leased property and no method where it would possess any right other than the use of the property. The leased property had a useful life substantially longer than the lease term and would have substantial value at the end of the lease term. No decision of a Federal District or Appellate Court or an Appellate Court of any state has been cited by counsel or discovered by the Court which has ever held an agreement under such circumstances to be anything other than a lease. To the contrary, the unanimous authority recognizes that a "lease intended as security" is one which has the ultimate intent of a sale. Wheatland Electric Products Co., supra; Hays v. Jordan and Company, 85 Ga. 741, 11 S.E. 833, 9 L.R.A. 373; Frito-Lay, Inc. v. United States, 209 F.Supp. 886 (N.D. Ga.); Benton v. Commissioner of Internal Revenue, 197 F.2d 745 (C.A.5); Burton, Receiver v. Tatelbaum, Receiver, supra;

The contentions of the trustee with reference to the obligations of the Times under the lease have been seriously considered. The Court finds nothing in these terms inconsistent with a lease. As the Maryland Court noted in the *Burton* case, supra:

"The lessor chose to impose conditions and obligations as to the leased property which were legal and, indeed, not illogical, in such a lease of personal property and the lessee knowingly and voluntarily chose to agree to those conditions and obligations. That the parties did so choose to so agree did not transform a lease into a sale." 213 A.2d at p. 879.

It must also be noted that the default provision in the lease is inconsistent with any theory other than leasing. It recognizes the right of the lessor to the value of the leased property at the end of the term.

The Court has been urged to view the transaction as if the total rent were the purchase price and the monthly rental the equivalent of installments. Such approach to the transaction overlooks the prime, essential distinction between a lease and a conditional sale, to wit: in a lease the lessee never owns the property. In the absence of a right or option in the lessee to acquire ownership of the leased property, the transaction is one of lease.

The Court concludes that the Equipment Lease dated February 7, 1964 is a bona fide lease intended by the parties thereto to be a lease. As such, the law requires no filing to protect the rights of CCC.

4. The Times defaulted under the terms of the lease by filing its petition in bankruptcy. Such a default provision is valid and enforceable. Section 70(b); 4 Collier on Bankruptcy, 14th Ed., pp. 1368, et. seq.

5. CCC had the right to reclaim the leased property by virtue of the default of the Times. Recording of its interest in the lease not being required to perfect its interest, and its rights being superior to those of the trustee of the Times, the petition for reclamation filed on behalf of CCC should be and the same hereby is granted.

6. The only matter remaining is the issue raised by the Petition for Turnover of the security deposit held by CCC. Since the other issues in this case have been fully developed, the Court is not faced with the duty to determine who should retain possession of the security deposit pending an adjudication of the rights of the trustee and CCC therein.

The security deposit was delivered to CCC by the Times to insure its performance under the terms of the lease. Viewed in this light, CCC had a security interest in the deposit. Money is frequently used as collateral or security in commercial transactions. The Court recognizes that a literal reading of Article 9 of the Commercial Code could leave unanswered questions arising over money as security; however, the concept and intention of Article 9 of the Code is to provide a method whereby all security interests can be perfected. In some instances, filing is required, and in others, possession of the collateral is the only means available or permitted whereby a creditor can perfect a security interest. In the case of money, as in the case of a negotiable instrument, possession logically is essential to perfection of a security interest. The only interpretation of the Article 9 that gives effect to its intention in this situation is to include money within the definition of "instrument" (Section 109A–9–105 (g)). See 79 Harvard Law Review 229, at pp. 261 et seq.

Since a security interest in money (either originally given or received as proceeds from the negotiation of an instrument) is perfected by possession (Sections 109A–9–305, 306), it is not necessary to determine if the security deposit in this case came within the exclusion of Section 109A–9–104(i) as being a setoff. The Court concludes

that CCC perfected its interest in the Times' security deposit.

7. CCC has claimed that it is entitled to off-set the security deposit it holds against the damages it has sustained by reason of the default of the Times. The default provision in the lease provides in substance that in the event of default CCC should recover as liquidated damages the difference between the total unpaid rental and the value received for releasing the leased property. Because the leased property is personalty rather than realty, and because it was specifically purchased by CCC for the Times, CCC also has the right to sell the property. The provision for computing liquidated damages is valid and enforceable. Irving Trust Co. v. A. W. Perry, Inc., 293 U.S. 307, 55 S.Ct. 150, 79 L.Ed. 279; Oldden v. Tonto Realty Corp., 2 Cir., 143 F.2d 916; Mion & Murray Co. v. Worldwide Pictures, Inc., 49 Ga.App. 539, 176 S.E. 83.

The leased property was sold pursuant to the Order of this Court and the sale thereof was confirmed by both the Court and CCC. The price received for the leased property was a fair price. The difference between the net proceeds received from the sale of the leased property, and the total unpaid rentals under the lease substantially exceeds the amount of the security deposit held by CCC.

Unlike a lease of realty, Section 63a(9) does not limit the provable and allowable claim for the breach of a lease of personalty to one year's rent, "There is no standard maximum to the Lessor's claim for damages where personal property is the object of the lease." 3 Collier's 14th Ed. 1912.

The Court therefore concludes that CCC is entitled to retain the security deposit paid by the Times and apply said amount as an off-set of the damages provided for in the lease.

## CONCLUSION

Counsel for CCC is directed to submit a judgment in conformity with the provisions of this Order within ten (10) days.

It is so ordered.

This the 23 day of May, 1966.