In the Matter of DeVITA FRUIT COM-
PANY, Bankrupt, Quentin M. Derry-
berry II, Trustee, Appellant,

v.

FCA LEASING CORPORATION,
Appellee.

No. 72–1520.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 5, 1972.

Decided Feb. 13, 1973.

Quentin M. Derryberry II, Trustee,
Lima, Ohio, for appellant.

Arnold F. Bunge, Jr., Toledo, Ohio,
for appellee.

Before PHILLIPS, Chief Judge, and PECK, Circuit Judge, and O'SULLIVAN, Senior Circuit Judge.

PHILLIPS, Chief Judge.

This is a reclamation action brought by the FCA Leasing Corporation (FCA) against the Trustee in Bankruptcy for the DeVita Fruit Company (DeVita) of Lima, Ohio, to recover certain citrus packing equipment. The Referee in bankruptcy found in favor of the Trustee. The District Court reversed. We affirm the conclusion reached by the District Court.

The facts were stipulated. On February 18, 1969, a conditional sales contract was entered into by DeVita with the Kipers Packaging Equipment Company (Kipers), the original seller, for the sale of the equipment. The agreement provided: "All prices F.O.B. Factories" and "Net 10 days." It further provided that the equipment would remain the property of Kipers until the purchase price was fully paid. Kipers was to have the right to repossess if not fully paid within 30 days.[1] The goods were delivered in thirteen shipments in the spring of 1969 with the several invoices reciting that the various portions were sold to DeVita. DeVita has never made a payment to Kipers although it has retained possession at all times. Kipers has never filed a financing statement.

In early May 1969, DeVita entered into an agreement with FCA in which FCA agreed to attempt to purchase the equipment from Kipers and then lease it to DeVita. This agreement was culminated on May 15, 1969, by the signing of a document described as a "lease." This agreement called for FCA to purchase the equipment and then lease it to De-Vita. DeVita was to pay $756.25 per month for five years as rent. Title was to remain in FCA at all times.[2] The agreement further provided that in the event of default in the rent obligation or the filing of a petition in bankruptcy by DeVita, FCA was to have the right to repossess.[3] There is no provision for

1. "Payment is due within 30 days after invoice date and purchaser agrees to pay all expenses incurred in collecting same including 18% attorney's fee and 6% interest if payment is not made when due and the purchaser agrees that the equipment described above remains the property of Kipers Packaging Equipment Inc. until fully paid for and may be repossessed by Kipers Packaging Equipment Inc. if not paid for according to the terms outlined above and that the purchaser is liable for all cost including legal, transportation and repairing equipment for resale. All material is subject to standard Kipers Packaging Equipment Inc. Guaranty and Warranty."

2. "The equipment is, and shall at all times be and remain, the sole and exclusive personal property of LESSOR, and the LESSEE shall have no right, title or interest herein except as expressly set forth in this Lease."

3. "In the event of any default by the LESSEE in the payment of rent for any Equipment continuing for ten (10) days, or in the event a petition, in bankruptcy or any other provision of the United States Bankruptcy Act, is filed by or against the LESSEE, or it executes an assignment for the benefit of its creditors, or it should otherwise default in the performance of its obligations hereunder and such default continues ten (10) days after notice thereof, LESSEE'S right to possession of the Equipment shall terminate and the LESSOR shall be authorized to take immediate possession thereto, and such event, notwithstanding such termination, the LESSOR shall be entitled to recover in addition to all charges, rents and other payments that may have previously accrued, an amount equal to ten percent (10%) of the total rent payable for the entire initial term plus, if such termination occurs during the initial term, an amount equal to the unpaid balance of the total rent for the initial term. In the event of any such default, the LESSOR shall have the right to exercise any one or more of the following remedies: To sue for and recover all amount due under the foregoing or any other provisions of this Lease; to take possession of any or all items of Equipment without demand or notice; or without removing the Equipment to make such changes therein as to prevent the use thereof by the LESSEE during continuation of default; or any other remedies at law or in equity. All such remedies are cumulative and may be exercised concurrently or separately and no repossession or other action by the

DeVita to take title at the termination of the lease or to have the option to purchase.

On June 6, 1969, Kipers issued to FCA an invoice for the packing machinery, reciting, "Sold to FCA," and "Shipped to DeVita." On June 11, 1969, Kipers issued an invoice to DeVita crediting it with the entire amount due under the previous invoices. On June 19, 1969, FCA tendered its check to Kipers for the full amount of the purchase. The entire transaction occurred without the equipment ever being removed from DeVita's possession.[4]

On August 31, 1970, over fifteen months after the lease agreement was executed, DeVita filed a petition for bankruptcy, and on December 8, 1970, it consented to being adjudicated bankrupt. On January 4, 1971, FCA filed a reclamation petition, based upon its rights under the lease, which the Referee denied on September 27, 1971. On September 30, 1971, the Referee confirmed the sale of the property in question. The parties have agreed that the claim of FCA may be asserted against the proceeds of the sale rather than the packing equipment. On March 27, 1972, the District Court held that the reclamation petition should have been granted.

The Referee adopted the Trustee's theory that on the sale from Kipers to DeVita, title passed to DeVita, leaving Kipers with only a security interest. This theory contends that because Kipers failed to perfect that security interest, DeVita became the sole "owner." Kipers therefore had nothing to sell to FCA and accordingly the sale and subsequent lease agreement was a nullity. This contention regards FCA as a subrogee of Kipers for the underlying debt. To reach this conclusion the Referee relied upon a 1935 decision in which this court analyzed the Ohio version of the Uniform Sales Act. In re Henselman, 79 F.2d 738 (1935). In *Henselman* a dealer of the Goodyear Tire & Rubber Company was slow in making payment on his Goodyear account. He entered an agreement with Goodyear wherein tires in the dealer's possession which he had not paid for would be transferred back to Goodyear and then, without moving the tires, Goodyear would allow the dealer to keep the tires and sell them on consignment. The dealer proceeded to sell the goods without doing anything that would indicate to his other creditors that the tires were owned by Goodyear. The court found that under Ohio law the transaction was a fraud upon creditors since Goodyear had failed to take possession when the tires were transferred back to it. The court held that the Trustee's claim was superior to that of Goodyear.

We do not find *Henselman* controlling. We hold that the Ohio Legislature in enacting the Uniform Commercial Code specifically provided a remedy of repossession for an aggrieved seller in Kipers' situation.

The District Court correctly distinguished *Henselman* and held that under the Uniform Commercial Code Kipers had the right to resell the goods on DeVita's default, that the resale divested DeVita of all rights as a buyer, and that the resulting lease was a bona fide lease

LESSOR shall affect the continued obligations of the LESSEE to make all payments hereinbefore provided for. In the event of any repossession, the LESSOR will pay to the LESSEE any amounts received by the LESSOR from any subsequent leasing of the Equipment during any unexpired portion of the initial term after deducting all reasonable costs of repossession, repairs and other expenses, including counsel fees incurred in connection therewith, but this provision shall not affect the obligation of the LESSEE forthwith upon default to pay to the LESSOR the full amount becoming due under the foregoing provisions of this paragraph."

4. Kipers issued the invoices without ever formally notifying DeVita that Kipers considered it in default of its contract and that Kipers intended to resell the goods at a private sale.

entitling FCA to the reclamation of its property.

■ Under the Uniform Commercial Code, Kipers' retention of title had the effect of the reservation of a security interest, §§ 1302.42(A) Ohio Rev.Code, [2–401(1) U.C.C.], 1301.01(KK) [1–201 (37)]; Evans Products Co. v. Jorgensen, 245 Or. 362, 421 P.2d 978 (1966). A security interest arising solely under the Sales Article (Article 2) is subject to the provisions of the Secured Transactions Article (Article 9), § 1309.11 [9–113]. Since this interest was created by a writing, signed by representatives of DeVita, and contained a description of the goods, it was enforceable against DeVita, § 1309.14 [9–203], 1309.01 [9–105, 106]; Bender's UCC Service, Dusenberg and King, Sales and Bulk Transfers § 11.02. The security interest in the present case attached as the parties agreed that it would attach, value was given and DeVita had rights in the collateral, § 1309.15 [9–204]. The fact that this particular interest was never perfected does not preclude enforcement against the defaulting buyer, § 1309.12 [9–201]; Anderson v. First Jacksonville Bank, 243 Ark. 977, 423 S.W.2d 273 (1968).[5] At the time of default there were no third party rights involved. § 1309.20 [9–301] lists those who take priority over an unperfected security interest. This does not include the debtor.

Since DeVita had not made any payments by May 1969, it was in default of the contract. Under § 1309.46 [9–503] Kipers had the right to repossess the collateral or to dispose of it on DeVita's premises under the provisions of § 1309.47 [9–504].[6] Section 1309.47(C) permits the secured party to resell the collateral at a public or private sale so long as every aspect of the disposition is commercially reasonable. Here there is no question that the entire transaction was commercially reasonable. Sub-section (D) provides that the disposition transfers to the purchaser for value all of the debtor's rights therein. It is further provided that where the purchaser buys in good faith, he takes free of all the debtor's rights even though the secured party failed to comply with all the requirements of §§ 1309.44–1309.50 [Part 5 of Article 9]. Good faith is defined as honesty in fact. Here there is no question but that FCA complied with this requirement. § 1301.01 [1–201].

The only issue remaining is whether the lease agreement is sufficient to withstand the attack of DeVita's Trustee in Bankruptcy. We hold that it is.

■ It is well settled that where property is in the bankrupt's hands as a bailee, the trustee also holds the property in the same capacity, and the bailor is entitled to recover his property from the trustee. 4A Collier on Bankruptcy, 14th

---

5. § 1309.12 provides: "Except as otherwise provided . . . a security agreement is effective according to its terms between the parties . . . ."

6. The Comment to § 1309.46 [9–503] provides:
"Under this Chapter the secured party's right to possession of the collateral (if he is not already in possession as pledgee) accrues on default unless otherwise agreed in the security agreement. This Chapter follows the provisions of the earlier uniform legislation in allowing the secured party in most cases to take possession without the issuance of judicial process. In the case

of collateral such as heavy equipment, the physical removal from the debtor's plant and the storage of the equipment pending resale may be exceedingly expensive and in some cases impractical. The section therefore provides that in lieu of removal the lender may render equipment unusable or dispose of collateral on the debtor's premises. The authorization to render equipment unusable or to dispose of collateral without removal would not justify unreasonable action by the secured party, since, under RC § 1309.47(C) [UCC 9–504(3)], all his actions in connection with disposition must be taken in a 'commercially reasonable manner.' "

ed. § 70.18 [4]. Thus where a pure lease is involved, the goods belong to the lessor and the trustee has no right to retain them. In re Atlanta Times, Inc., 259 F.Supp. 820 (N.D.Ga.1966), aff'd Sanders v. National Acceptance Company of America, 383 F.2d 606 (5th Cir. 1967); Sanders v. Commercial Credit Corp., 398 F.2d 988 (5th Cir. 1968).

When the lease is intended as a security interest, Article 9 applies. § 1309.02 [9–102]. However, a bona fide lease is not affected by Article 9. § 1301.01(KK) [1–201(37)] gives some guidance concerning when a reservation of title in a lease agreement may be found to be in fact the reservation of a security interest. That section provides in part:

"Unless a lease or consignment is intended as security, reservation of title thereunder is not a 'security interest' but a consignment is in any event subject to the provisions on consignment sales, section 1302.39 of the Revised Code. Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security."

Here there is no evidence of an intent to reserve a security interest and in particular there are no provisions whereby DeVita was to be entitled to purchase the equipment at the expiration of the term. FCA is therefore entitled to the return of its property. In re Metropolitan Offset Printers, Inc., 391 F.2d 770 (3rd Cir. 1968); Burton, Rec'r v. Tatelbaum, Rec'r, 240 Md. 280, 213 A.2d 875 (1965); United States Leasing Corp. v. Hall, 264 N.C. 110, 141 S.E.2d 30 (1965).

Affirmed.