**Warren SHELL and Patti Anne Shell, d/b/a Shell Home Supply, Bankrupts.**

**CAPITAL TYPEWRITER COMPANY, INC., Appellant,**

**v.**

**Charles Darwin DAVIDSON, Trustee in Bankruptcy, Appellee.**

**Nos. LR–74–B–207, LR–74–B–208.**

United States District Court, E. D. Arkansas, W. D.

Feb. 21, 1975.

Frank J. Wills, Little Rock, Ark., for appellant.

Charles Darwin Davidson, Trustee pro se.

## MEMORANDUM OPINION

HENLEY, Chief Judge.

These two voluntary bankruptcy cases are now before the Court on appeal by Capital Typewriter Company, Inc. of Little Rock, Arkansas, from an order of the Bankruptcy Judge to the effect that the Trustee in Bankruptcy, rather than Capital, is the owner of a certain Smith Corona typewriter which the bankrupts acquired from Capital in 1972 for use in connection with their business in England, Arkansas. This is the second time that the controversy has been before the Court.

The bankrupts, Warren Shell and his wife, Patti Anne Shell, filed their voluntary petitions in bankruptcy in April of 1974. In their schedules they listed the typewriter in controversy as an asset, and the Trustee duly took possession of it. Thereafter Capital filed a reclamation petition alleging that the transaction between it and the bankrupts, or more properly between it and Mr. Shell, amounted to nothing more than a lease of the typewriter, and that the machine belonged to Capital rather than to the Trustee. The Trustee responded to the petition alleging in substance that the transaction was a conditional sale of the machine on credit, and that the security interest of Capital was inferior to the title of the Trustee for the reason that Capital had not complied with the filing requirements of Article 9 of the Uniform Commercial Code which has been in effect in Arkansas since 1961.[1]

On June 19, 1974 the Bankruptcy Judge without a hearing and apparently by reference simply to the face of the written contract entered into between Mr. Shell and Capital on November 13, 1972 characterized the transaction as a conditional sale; and on the basis of the fact that Capital had not complied with the filing requirements of the Code held that title to the typewriter was in the Trustee and dismissed Capital's petition.

Capital appealed, and on July 25, 1974 this Court remanded the case to the Bankruptcy Judge for an evidentiary hearing. In a letter opinion the Court expressed the view that the contract in question was ambiguous and suggested that in the course of the hearing certain possible clarifying factors be developed and considered.

In due course the hearing was held, and the Bankruptcy Judge took the testimony of three employees of Capital and that of Mr. Shell. At the conclusion of the hearing the Judge adhered to his original characterization of the transaction and again dismissed the reclamation petition. Capital has again appealed.[2] In reviewing the Judge's decision,

1. Ark.Stats., Ann., § 85–9–101 et seq., particularly §§ 9–102, 104, 204, 302 and 410. As will presently be seen, the transaction between Capital and Mr. Shell was evidenced by a written contract entitled "Rental Agreement." If that contract created a "security interest" in the typewriter, as the term "security interest" is defined in the Code, Ark. Stats., Ann., § 85–1–201(37), and if Capital desired to comply with the filing requirements of the Code so as to protect its interest against the claims of third parties, including a trustee in bankruptcy, Capital would have been required to file copies of the contract with the Arkansas Secretary of State and with the County Clerk of Lonoke County, Arkansas where the bankrupts were doing business.

2. This particular controversy between Capital and the Trustee involves less than $200.00. However, as the Bankruptcy Judge recognized

this Court is required to accept the Judge's findings of fact unless they are clearly erroneous. Federal Bankruptcy Rule No. 810, 11 U.S.C.A.

The record reflects that Capital has been engaged in business in Little Rock for many years. The contract form executed by Mr. Shell and entitled "Rental Agreement" was adopted by Capital in 1948 and has remained substantially unchanged; however, when the Federal Truth in Lending Act became effective a number of years ago, the contract form was amplified so as to comply with the disclosure requirements of the Act.

The contract signed by Capital and Shell purports to be a lease of a typewriter with the purported lessee obligating himself to pay monthly rentals for a period of six months, but with the option to continue to pay the rentals for an additional sixteen months. If rentals are paid for those sixteen months, then the "lessee" has the option to buy the machine for a nominal additional cash payment.

In Mr. Shell's case the monthly rentals called for in the contract were $15.00 each. Shell agreed to pay a minimum of six months' rental on the machine; he also agreed that he would be liable as an insurer of the machine to the extent of $336.55 against all hazards for the safe keeping of the property, reasonable wear and tear excepted. He also agreed not to remove the machine from his place of business without the written consent of Capital, and that upon breach or failure to perform any of the conditions of the contract he would return the typewriter to Capital. The contract further recited:

" . . . I (we) agree that upon the expiration of 22 months, all rental due having been paid, option to purchase is hereby given and I (we) will give 15 days notice to the Capital Typewriter Company, Inc. of (my, our) intention to exercise the option to purchase said property herein described at the price of $6.55, or to return same within 15 days after expiration of the above designated period. . . ."

On the right hand side of the contract appear the disclosures called for by the Truth in Lending Act. Those disclosures are prefaced by the statement, "If you exercise the option to purchase the equipment described herein, the purchase price will be determined as follows: . . ." The disclosures then reflect a cash price, a sales tax figure, a down payment figure, an unpaid balance of cash price, an amount financed, a finance charge, a charge for a mechanical service guarantee, a total of remaining payments, and ultimately a deferred payment price of $336.55, which is the same amount as that for which Mr. Shell became responsible as an insurer in that portion of the contract which appears on the left hand side of the document. The disclosures also recite that the finance charge had been calculated at an effective interest rate of 10% simple interest per annum, the maximum interest rate allowed by Arkansas law.

Mr. Shell paid the initial $15.00 called for by the contract in advance. Thereafter he did not make his payments regularly, but between January and November, 1973 he made three payments totaling $180.00, an amount equal to twelve monthly payments of $15.00 each. While Capital sent Mr. Shell certain delinquency notices, it made no effort to repossess the machine, and it was in Mr. Shell's possession when the bankruptcy petitions were filed in April, 1974.

No claim is made that Capital complied with the filing requirements of the Code, and the parties are in agreement that the only question before the Bankruptcy Judge and the only question now before this Court is whether the

at the conclusion of the hearing, the question is a recurring one and is important in connection with the Administration of the Bankruptcy Act and the protection of the general creditors of bankrupts from latent liens

or claims. The question is of obvious importance to Capital because most of its transactions involving typewriters are evidenced by the same kind of contract that was used in the case of Mr. Shell.

transaction between Capital and Shell should be characterized as a lease or whether it should be characterized as a conditional sale on installment credit. To phrase the same question slightly differently, it is whether the lease constituted or created a "security interest" within the meaning of the Code, in which case Capital was required to file copies of it to protect its interest, or whether it was simply a lease in which case no filing was required.

Ark.Stats., Ann., § 85–1–201(37) defines a security interest as an interest in personal property or fixtures which secures payment or performance of an obligation, and provides that the retention or reservation of title by a seller of goods that have been delivered to the buyer prior to full payment therefor is limited in effect to a reservation of a security interest.

And the same subsection of the Code recognizes that a contract of lease may amount to a security interest. In pertinent part the subsection reads:

"  .  .  . Unless a lease or consignment is intended as security, reservation of title thereunder not a 'security interest' but a consignment is in any event subject to the provisions on consignment sales  .  .  .. Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security."

■ In cases arising under the Code it has been established that ultimately the question of whether a lease of personal property is in fact a contract of conditional sale depends upon the intent of the parties. If the contract is unambiguous, if it purports to be a lease, and if it gives to the lessee no right or option to acquire the property during or at the end of the lease term, then the transaction is to be characterized as what it purports to be. On the other hand, if the contract gives to the purported lessee the right or option to acquire title to the property, then the transaction may be a conditional sale. In some instances the courts will not look beyond the contract documents; in others regard will be had to parol evidence to establish the true intent of the parties to the contract. See General Electric Credit Corp. v. Bankers Commercial Corp., 1968, 244 Ark. 984, 429 S.W.2d 60; United Rental Equipment Co. v. Potts & Callahan Const. Co., 1963, 231 Md. 552, 191 A.2d 570; Sanders v. Commerical Credit Corp., 5 Cir., 1968, 398 F.2d 988; Sanders v. Nat'l Acceptance Corp. of America, 5 Cir., 383 F.2d 606, aff'g. In re Atlanta Times, Inc., N.D.Ga., 1966, 259 F.Supp. 820; Dynalectron Corp. v. Jack Richards Aircraft Co., W.D.Okl., 1972, 337 F.Supp. 659; In re Wheatland Electric Products Co., W.D.Pa., 1964, 237 F.Supp. 820; Anderson's Uniform Commercial Code (Rev. Ed.) pp. 145–147; see also annotations appearing in 30 A.L.R.3d 9 and 11 A.L.R.3d 1231.

As has been seen, the Bankruptcy Judge found ultimately that the transaction between Capital and Mr. Shell amounted to a conditional sale, and that the Rental Agreement signed by the parties was a security interest. It would have been helpful had the Judge made some subsidiary findings or prepared an opinion setting out his reasoning in coming to his ultimate conclusion. However, the Court has considered the transcript of the hearing on remand and is convinced that the evidence warranted certain inferences unfavorable to Capital as far as the characterization of the Shell transaction is concerned. The Bankruptcy Judge may or may not have drawn all inferences permissible from the evidence, but he certainly drew the inference that the transaction with Mr. Shell was a conditional sale and not a lease.

It appears from the testimony of Capital's own personnel called as witnesses that Capital is engaged primarily in the sale of typewriters and other items of office equipment although it does rent machines on short term bases. The rental rates on short term contracts as a renting by the day, or the week, or the month, are substantially higher than the monthly payments that were required during 1972 under contracts, like that of Mr. Shell, which Capital's employees refer to as "lease-ownership" or "rental-ownership" contracts.

Presumably, some typewriters and other items of equipment are sold by Capital for cash or perhaps on open account. However, it is rather clear that most of the sales of typewriters are on installment credit. A person desiring to acquire a typewriter to be paid for over a period of months has a choice of two plans. He can execute a conventional conditional sale contract, or he can execute a "lease-ownership" contract. The testimony is to the effect that the conventional conditional sale contract runs for a shorter period of time and calls for larger monthly payments than does the "lease-ownership" contract. Approximately eighty per cent of Capital's business involves "lease-ownership" contracts, and about eighty-three per cent of the persons who acquire a typewriter under those contracts ultimately acquire ownership of the machines by paying "rental" for twenty-two months and then making the small additional payment called for by the contracts.

Transactions involving "lease-ownership" contracts are treated by Capital on its books and for income tax purposes as conditional sales. Typewriters disposed of under those contracts are taken out of inventory, and Capital does not depreciate them while they are in the possession of the lessees. If a customer fails to acquire ownership of the machine and returns it to Capital, it is put back into inventory at its depreciated value.

While Capital's witnesses undertook to explain Capital's handling of the "lease-ownership" transactions in a manner consistent with the idea that the contracts involved are really contracts of lease and not of sale, the Court thinks that the Bankruptcy Judge would have been warranted in concluding that Capital simply has two conditional sales plans for typewriters, one of which may be chosen by some buyers while the other may be chosen by other buyers.

However, the Court does not know that the Bankruptcy Judge went that far, and the Court finds it unnecessary to do so since it is abundantly clear from the record that the particular transaction involving Mr. Shell was a sale and was understood to be such both by him and by the Capital employees who dealt with him. The testimony reflects that prior to 1972 Mr. Shell had purchased a typewriter from Capital under the "lease-ownership" plan, that he was familiar with the plan, and knew that the monthly payments under it were smaller than those called for by the other plan. He came into Capital's place of business to buy a typewriter, and Capital intended to sell him a typewriter. The "lease-ownership" contract was used because Mr. Shell preferred it. Mr. Shell testified that he included the typewriter in a "financing statement" that he executed in favor of the Bank of England, Arkansas, in May, 1973, and that he scheduled it as an asset when he and his wife filed their petitions in bankruptcy but inadvertently failed to list Capital in his schedules as a creditor.

From what has been said, it follows that the Bankruptcy Judge was correct or at least justified in his holding that the transaction was a conditional sale, that the contract executed by Shell and Capital was a security interest required by the Code to be filed, and that in view of the absence of filing title to the machine vested in the Trustee. Accordingly, the second Order of the Bankruptcy Judge dismissing the reclamation petition of Capital will be affirmed.

An appropriate order will be entered.